### UNITED STATES of America

v.

### Carol BAYLESS, Defendant.

### No. 95 Cr. 533 (HB).

United States District Court,
S.D. New York.

Jan. 22, 1996.

Jay Holtmeier, David Lewis, Assistant United States Attorneys, New York City, for the Government.

Ramon Pagon, Bronx, New York, for Defendant.

### Decision and Order

BAER, District Judge.[1]

Defendant Carol Bayless was charged in connection with an alleged cocaine and heroin distribution conspiracy. Defendant now moves to suppress (1) physical evidence seized from the car she was driving at the time of her arrest, and (2) her post arrest statements. The Government consented to a hearing on defendant's motion. On January 3 and 4, 1996 I heard testimony from three New York City Police Officers,[2] viewed the defendant's video-taped statement and heard argument from the Government and defense counsel.

For the reasons which follow, I find that the stop was in violation of the defendant's

Fourth Amendment rights and, therefore, defendant's motion to suppress is GRANTED.

### I. *Background*

The great enemy of truth is very often not the lie—deliberate, contrived, and dishonest—but the myth—persistent, pervasive and realistic.[3]

Defendant Carol Bayless, a middle-aged black woman was arrested at approximately 5:00 a.m. on April 21, 1995 at the corner of 176th Street and Amsterdam Avenue in the Washington Heights section of New York City. At the time of her arrest, defendant was driving an Alamo Rental Car with Michigan license plates. When police officers opened the trunk of the car, a 1995 Red Chevrolet Caprice, they found two duffle bags containing approximately 34 kilograms of cocaine and 2 kilograms of heroin.

The prosecution's version of the events leading up to the defendant's arrest differs dramatically from that of the defendant in her videotaped statement. Accordingly, I have divided the background section into two parts so as to more clearly spell out these discrepancies. Let me say at the outset, that based on the defendant's videotaped admissions about the events leading up to the stop, the search and her arrest, including statements which unequivocally implicate her own son, I find her statement to be credible and reject the testimony proffered by Officer Carroll.

### a. Testimony of the Arresting Officer

Police Officer Richard Carroll testified that on April 21, 1995 he and his partner, Sergeant Bentley, both 10 year veterans of the police force, were assigned to a plain clothes anti-crime patrol unit. On this night, they were to patrol the northern end of Manhattan, the province of the 32nd, 33rd

1. Jennifer Chapin, an L.L.M. candidate at the New York University School of Law, contributed to the research for this decision and order.

2. Although three police officers testified, only the testimony of Officer Carroll is pertinent. The testimony of the other two officers, Officer Rich-

ard Clarke and Detective Gene Torriente, a DEA Task Force Officer, involved events that followed the incident at issue here.

3. President John F. Kennedy, Commencement Speech, Yale University 1962.

and 34th Police Precincts.[4] Tr. at 25. Officer Carroll defined the area of patrol to be "from 155th Street up to the tip of Manhattan, everything north of 155th." Tr. at 4. Officer Carroll characterized this entire area as "an area known for its high drugs ... a hub for the drug trade." Tr. at 5.

At approximately 5:00 a.m. on April 21st the officers, who were in an unmarked patrol car, turned onto 176th Street and observed the defendant's car shortly thereafter. Tr. at 4–5. Officer Carroll testified that when he first saw defendant's car, it was moving slowly along 176th Street. Before reaching the intersection of 176th Street and St. Nicholas Avenue the defendant pulled over to the north side of the street and double parked the car. Tr. at 5.[5] The officers did not observe any one in addition to the driver in the car. *Id.*

Officer Carroll testified that as soon as the car stopped, four unidentified males emerged from between parked cars on the south side of the street. Tr. at 6. The males crossed the street walking single file, the defendant leaned over to the passenger side of the car and pushed the button for the trunk release. *Id.* The first male then lifted the trunk open, the second and third males each placed a large black duffel bag into the trunk and the fourth male closed the trunk. *Id.* Officer Carroll testified as follows:

As soon as the auto stopped, I observed four males come from the south sidewalk between parked autos. They entered the street in a single file-like walk to the rear of the auto. I saw just before they reached it the driver of the auto lean over into the passenger side of the car. The trunk opened a few inches. The first male opened the trunk. The next male came and through [sic] a duffle bag, a large black duffle bag into the back. Another

large male was also carrying a black duffle bag, and he threw that into the back. The fourth male came and closed the trunk.

Tr. at 6. Officer Carroll testified that he did not observe any conversation between the males and the driver of the car and the entire transaction occurred within seconds. *Id.*

The driver of the auto then proceeded to the corner of 176th Street and St. Nicholas Avenue where she waited for the light to turn from red to green. Tr. at 6. The officers pulled up behind the Chevrolet Caprice and also waited for the light to change. Tr. at 6. According to Officer Carroll he did not signal the driver to pull the car over nor did he encourage the driver to proceed through the intersection. Tr. at 6–7.

At this time the four males were standing on the sidewalk on the north side of the street and when the officers' car came to a stop, the officers were staring at the males. Tr. at 7. According to Officer Carroll, two of the males noticed the police officers, spoke briefly to each other and:

[a]t that point the four males moved in different directions at a rapid gait. The individual that ... [Officer Carroll] watched went to the corner of 176th and St. Nicholas, and as he reached the corner began to run northbound on St. Nicholas.

Tr. at 7.[6]

According to Officer Carroll, the light changed to green shortly thereafter and the defendant proceeded at a normal rate of speed through the intersection and continued along 176th Street. Tr. at 7. The officers followed behind and asked officers in another car if they would, via computer, run a check on the Michigan license plate. Tr. at 7. Two blocks later, the officers turned on the red

4. The arresting officers transported defendant to the 33rd precinct where she was processed and interrogated by members of the New York Drug Enforcement Task Force. Tr. at 14. The defendant's statement was videotaped at the 33rd precinct.

5. Officer Carroll testified that "[t]he vehicle was ahead of us. I observed it driving slowly, much as we were. It pulled over to the north side of

176th Street, close but not at the intersection of St. Nicholas, double parked." Tr. at 5.

6. The officers made no effort to stop any of the males at that time nor did they radio for help to locate and arrest the males. Tr. at 55–56. The only action taken to locate the males occurred hours later when Officer Carroll joined the defendant and other officers on a "drive-around" in an attempt to locate the males. Tr. at 24.

"fire-ball" light on their dashboard and pulled the defendant over. Tr. at 8.

When asked by the Court what prompted the officers to pull the defendant over, Officer Carroll replied: "Sergeant Bentley wanted to stop the auto before it got onto a major roadway, and the highway was just ahead." Tr. at 8. At this time the officers had not received a response from the computer check on the license plate and did not know that the defendant was operating a rental car. Tr. at 8. After further inquiry, Officer Carroll testified that he was prompted to pull the defendant over based on the following observations: the car had an out-of-state license plate; the actions of the four males, particularly the way they crossed the street in single file and did not speak with the driver of the car; the fact that the males ran once they noticed the officers; and the duffle bags the males placed in the trunk of the car. Tr. at 8, 9–10.

Once the defendant pulled the car over to the side of the road, Officer Carroll approached the vehicle and asked to see defendant's driver's license, registration and proof of insurance. Tr. at 11. Officer Carroll testified that following the stop he did not have any conversation with the defendant about why he pulled her car over or why he was interested in looking into the trunk. Tr. at 13, 16. Subsequent to her arrest, the defendant was questioned by a number of law enforcement officials and gave both written and videotaped post-arrest statements. Pl. Exs. 7, 8.

### b. The Defendant's Videotaped Statement

As I stated previously, the defendant's version of the events surrounding her arrest differs significantly from that recounted by Officer Carroll.[7] Her candor and the breadth and nature of her statements give her statement great credibility. Specifically, in her videotaped statement, defendant admits to her role in the transaction and that of her son and his associates. The defendant also detailed her involvement in 20 other similar transactions and all this without any promise of immunity or even special consideration.[8]

According to the defendant, she left Detroit, Michigan for New York City at approximately 6:30 p.m. on April 20th. At that time, she was riding as a passenger in the Red Chevrolet Caprice and a man named Terry drove the car to New York City. The purpose of the trip was "to get some drugs and to come back home."

Prior to leaving Detroit, Robert and Chubb, two associates of defendant's son, placed five duffle bags containing money into the trunk of the Caprice and then drove in a van, along with a third man, to New York. Defendant estimated that the bags contained $1,000,000. Once the two vehicles arrived in New York City, they proceeded to 176th Street where the defendant saw four men, "Roberto, his two brothers and a worker." According to the defendant, it was customary for Robert to call Roberto when they were about an hour outside of the city "so he [Roberto] can be ready for us when we get here." At 176th Street Terry stopped the car and Robert exited the van and opened the trunk of the Caprice and along with Chubb, took the money inside the apartment building. Robert directed Terry to move the van around the corner, the defendant waited in the Caprice.

The defendant stated that Robert and Chubb were inside the apartment building for about ten minutes while she was parked

---

7. Any quotations and references herein to defendant's statement refer to a copy of the videotaped statement provided to me by the Government and marked as Pl.Ex. 8. Although the government did not prepare a transcript of the videotape, one was prepared for the limited purposes of this decision within my chambers.

8. At the end of her videotaped statement, defendant stated that no police officers threatened her in exchange for her testimony, nor did any officer promise her anything in exchange for her testimony. Defendant did not testify at the suppression hearing. It is unclear whether defense counsel intended to call the defendant to the stand. Midway through the proceedings on January 4, 1996 defense counsel notified the Court that his client was ill with a stomach ailment and needed to be removed from the Courtroom. Defendant waived her right to be present for the remainder of the proceedings. Tr. at 111, 128–29.

outside. Then "when they came down they opened the trunk back up and put the two bags in there and handed me the keys and I proceeded to pull off." After Robert and Chubb put the bags into the trunk the defendant observed that "they started walking" away. When the defendant was unable to determine whether the men walked north, south, east or west, the interrogating officer asked "Well, was it in the same direction that you drove in the direction that you drove away *they were walking, they walked?*" (Emphasis added.) The defendant responded in the affirmative.

Thereafter defendant proceeded to the corner of 176th Street and St. Nicholas where she waited for the traffic light to turn green. While sitting there, she noticed a car behind her; "I could see the car in the next block, just sitting there, o.k. I seen it I was aware of the car." The defendant stated that the car pulled up behind her as she waited for the light to change and the car behind "flashed the red light." The defendant, unsure that a police car was behind her, stated that the events unfolded as follows:

> New York police cars are different and this was an unmarked car, o.k., and it [the red fire-ball light] was like up in the dashboard. Our cars, they have the lights out on the hood but I knew it was something. So the light turned green and I proceeded to go straight across and then as the red light was flashing I seen another light and stopped. And I just sat there and finally the police officers they got out, they identified themselves, they asked me for a driver's license and registration and stuff and I gave it to them. And then they said what's in the trunk? I said I don't know and they said uh give me the keys. So I gave them the keys and they opened up the trunk. Then I got arrested.

9. Defendant stated that her son and others compensated her for a number of her trips to New York City. On each of those occasions, she came solely to pick up drugs and return to Detroit. Defendant further acknowledged that she received gifts from her son and others in compensation and that she knew that the money received and the gifts purchased were from the proceeds of drug transactions.

Defendant admitted that when she told the officers that she did not know what was in the trunk she was not telling the complete truth. However, she clearly stated that she knew that there were narcotics in the trunk but that she thought there was only cocaine in the trunk, when, in reality, there was both cocaine and heroin and in fact she never saw what was in the bag. Defendant stated that she expected to be paid $20,000 by her son and others for this trip and that she had made approximately 20 similar trips between 1991 and 1995.[9]

## II. *Discussion*

Defendant moves to suppress the physical evidence seized from the car she was driving at the time of her arrest [10] and her post-arrest statements. The inquiry here is whether the evidence seized and the statements given were the fruits of a search and seizure made in violation of the defendant's Fourth Amendment rights. Put another way, did Officer Carroll and Sergeant Bentley have a reasonable suspicion that defendant was involved in criminal activity when they stopped her car?

I have reviewed extensively the briefs submitted by the parties, the testimony of their witnesses, the arguments put forth by counsel, and the numerous cases cited by the Government. The essence of the Government's argument is that Officer Carroll and Sergeant Bentley had a reasonable basis for stopping the defendant and that their "Terry-type" investigative stop of defendant did not violate her Fourth Amendment rights. I disagree. I find that the defendant's conduct when viewed objectively by trained officers familiar with drug trafficking and in the context of the events which occurred in the early morning of April 21st, does not give rise to a reasonable suspicion that criminal activity was afoot.

10. At the time of her arrest, officers found 34 kilograms of cocaine and 2 kilograms of heroin in the trunk of defendant's car. There is some question as to whether the trunk was opened, and the drugs seized, prior or subsequent to defendant's arrest. The Government maintains, however, that inevitably the drugs would have been discovered as the result of a lawful inventory procedure required by the New York City Police Department.

### a. The Validity of an Investigative Stop.

█ If the initial stop of defendant's vehicle violated defendant's Constitutional rights, any subsequent search or evidence seized by virtue of the violative stop will be suppressed under the "fruit of the poisonous tree" doctrine. *Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963).[11] Thus, the focus of my inquiry here is on the stop.

█ This Circuit has recognized three levels of interaction between government agents and individuals; consensual encounters, limited investigative stops, i.e. "Terry-type" stops, and arrests. *United States v. Tehrani,* 49 F.3d 54, 58 (2d Cir.1995) (citing *United States v. Hooper,* 935 F.2d 484, 490 (2d Cir.1995) *cert. denied,* 502 U.S. 1015, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991)); *see also United States v. Glover,* 957 F.2d 1004, 1008 (2d Cir.1992). A consensual stop is not considered a seizure under the Fourth Amendment and thus may be initiated by a government agent, such as a police officer, without any level of suspicion. *Id.* In contrast, a limited investigative stop or an arrest amounts to a seizure under the Fourth Amendment and must be premised on a heightened standard.

█ A limited investigative stop, which is the stop at issue here, must be based on "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (*quoting Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Likewise, the Constitution requires that an arrest be rooted firmly on the existence of probable cause that the person arrested is or was involved in criminal activity. *Glover,* 957 F.2d at 1008.

█ The Supreme Court recognized a limited exception to the probable cause standard for an investigative stop under the Fourth Amendment in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In evaluating the reasonableness of an investigative stop, the law requires a two part inquiry. First, whether the stop itself was based on a reasonable suspicion that the suspect "is, has been, or is about to be engaged in criminal activity." *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879. Second, provided the first inquiry is satisfied, a reviewing court must inquire into whether the stop was reasonably related in scope to the circumstances which justified the stop. *Id.*

█ Focusing on the first of these two inquiries, the Court requires government agents to point to specific and articulable facts which, along with rational inferences drawn from those facts, reasonably suggests that criminal activity has occurred or will occur imminently. *Terry,* 392 U.S. at 21, 88 S.Ct. at 1879–80. Reasonable suspicion is a less demanding standard than probable cause. As the Court stated in *Alabama v. White:*

> it can be established with information that is different in quantity or content than that required for probable cause.... [and it] can arise from information that is less reliable than that required to show probable cause.

*Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990).

█ Thus the law requires that an investigative stop be based on a minimal level of objective justification. A stop cannot be premised on an officer's intentions or motivations nor can a stop be based on an officer's inchoate suspicion or mere hunch. *Glover,* 957 F.2d at 1009–10 (citations omitted). An officer's action must be justified at its inception and will not comport with Fourth Amendment requirements unless the officer can articulate specific and articulable facts which along with rational inferences drawn from those facts, create a reasonable suspicion that the person stopped is or was engaged in criminal activity. *See United States v. Alexander,* 907 F.2d 269, 272 (2d Cir.1990) (citing *United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2581–82, 45 L.Ed.2d 607 (1975)).

11. If the initial stop of the vehicle was not justified, it follows that the subsequent search of the vehicle was not lawful and but for the illegal stop, the evidence would not have been discovered. *United States v. Betemit,* 899 F.Supp. 255, 263 (E.D.Va.1995) (citations omitted).

The Second Circuit views factors and activities such as a person entering a building which is known as a location where drugs are sold or a person's evasive and erratic driving patterns when leaving a building under police surveillance as sufficient to give rise to a reasonable suspicion that the person is engaged in criminal activity. *See United States v. Vasquez,* 638 F.2d 507, 523 (2d Cir.1980), *cert. denied,* 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981); *United States v. Ginsberg,* 758 F.2d 823, 828 (2d Cir.1985); *see also United States v. Bechdel,* 1988 WL 2501 (E.D.N.Y.1988).

Through a progeny of cases the federal courts have articulated a clear standard by which the conduct of police officers and government agents engaging in investigative stops is to be measured. Although the standard of reasonable suspicion is less than that of probable cause as required for an arrest, this standard is one which firmly exists as a protector of our Fourth Amendment right to be free from unreasonable searches and seizures. Accordingly, as Judge Timbers stated in *United States v. Buenaventura–Ariza,* 615 F.2d 29, 31 (2d Cir.1980), "[o]f necessity there must be a line separating investigatory stops supported by 'specific, objective facts' from those stops occurring essentially at the 'unfettered discretion of officers in the field.' " (quoting *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979)).

### b. The Investigative Stop is Invalid.

In evaluating whether Officer Carroll and Sergeant Bentley had a reasonable suspicion that defendant was involved in criminal activity when they stopped her car, I must focus on the totality of the circumstances, as viewed from the officer's perspective and experience in the early morning hours of April 21, 1995. At the hearing, Officer Carroll testified that he pulled over the defendant's car as directed by Sergeant Bentley who "wanted to stop the auto before it got onto a major roadway, and the highway was just ahead." Tr. at 8. Officer Carroll testified to what in his view constituted the specific and articulable factors underlying his reasonable suspicion that defendant was en-

gaged in criminal activity: the neighborhood; the car's out-of-state license plate; the fact that the car was moving slowly and then double parked; the actions of the four males, particularly the way they crossed the street in single file and did not speak with the driver of the car; the fact that the males scattered once they noticed the officers staring at them; and the duffle bags the males placed in the trunk of the car. Tr. at 8–10. I find that even collectively, these facts fail to meet the requisite standard of reasonable, articulable suspicion that any criminal activity was afoot and that is assuming Officer Carroll is to be believed.

The testimony offered by Officer Carroll about how the events of April 21st unfolded when juxtaposed with the defendant's full fledged videotaped confession suggest that Officer Carroll's testimony is at best suspect. I place considerable weight on the defendant's statements because of how they incriminate her, her son and others and because at the time the statements were made, the defendant unlike the Officer, had no reason to color the facts. Furthermore, the defendant's version of the events, recorded twelve hours or less after her arrest, is likely to be a more accurate statement of what occurred that morning than an officer's testimony offered more than eight months after the events took place. And where, one may wonder was the officer in charge, Sergeant Bentley? While presumably available to corroborate this officer's gossamer, he was never called to testify.

Officer Carroll testified that when he first observed defendant, she was driving a Red 1995 Chevrolet Caprice slowly along 176th Street. Tr. at 5. In contrast, defendant asserts that she did not drive to New York City from Detroit, rather she was a passenger in the Caprice driven by Terry. Further, defendant did not get behind the wheel of the car until after it was stopped on 176th Street and Terry had exited the vehicle. Put another way, Officer Carroll apparently missed or overlooked the fact that the car had come to a halt, never saw the man exit the Caprice, and missed the million dollars being taken out of the trunk. If we credit the defendant's statement, and I do, one

cannot keep from finding Carroll's story incredible.

■■■ The mere presence of an individual in a neighborhood known for its drug activity, which here was characterized as from 155th Street to the end of Manhattan, fails to raise a reasonable suspicion that the person observed is there to purchase drugs. *United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir.1987) (quoting *United States v. Constantine*, 567 F.2d 266, 267 (4th Cir.1977) (presence of suspect in high crime neighborhood is not enough to raise a reasonable suspicion, but may constitute an articulable factor)). Similarly, the hour at which a person is in a known high crime neighborhood should not give rise to a reasonable suspicion that they are involved in criminal activity but may constitute an articulable fact to consider. *See United States v. Lender*, 985 F.2d 151, 154 (4th Cir.1993) (fact that defendant was observed in known drug area at 1:00 a.m. is only a fact raising the level of suspicion). Here, the defendant was observed in an area allegedly known for its drug trading.[12] Yet, I find nothing unusual about the time at which she was observed. In New York City, people travel to and from work at all hours of the day and night. This would be an even more reasonable time to be abroad where as here a Michigan resident on a visit to New York was returning to her home state and wanted to get there before nightfall.

Further, unlike Officer Carroll, I do not find it odd that a person is seen to drive a car with a Michigan license plate in Manhattan. In his testimony, Officer Carroll put great stock in the fact that defendant was driving a car with an out-of-state license plate at the time of her arrest and that she double parked on a city street. In a city which considers itself "The Capital of the World" and which is regularly crowded with out of state and foreign visitors who come by plane, train, boat and certainly car, it is not odd to see a license plate from another state.[13] Similarly, while it might be unfortunate, it is certainly not odd for one to observe double parked cars on a Manhattan street. It is often the case that cars are double parked, even tripled parked on Manhattan's busy avenues and side streets. What I find shattering is that in this day and age blacks in black neighborhoods and blacks in white neighborhoods can count on little security for their person. As Thomas Paine wrote just 220 years ago next month:

> Here, then is the origin and rise of government; namely, a mode rendered necessary by the inability of moral virtue to govern the world; here too is the design and end of government, viz., Freedom and security.[14]

The Eastern District of New York and the Eastern District of Virginia have recently found a failure of proof in cases similar to this one. *See United States v. Restrepo*, 890 F.Supp. 180, 194 (E.D.N.Y.1995) (stop violated Fourth Amendment because it lacked proper basis; defendant was not speeding or violating any traffic ordinances, rather, defendant was stopped and questioned solely because he was driving a car with out-of-state plates and appeared to be Hispanic); *see also United States v. Betemit*, 899 F.Supp. 255, 262 (E.D.Va.1995) (Court determined real reason for the stop was the expensive car with tinted windows, the out-of-state plates and that it was occupied by three young, black males).

Several cases cited by the government advance the proposition that double parked cars with out of state license plates may be factors in assessing whether reasonable sus-

---

**12.** Interestingly, the Government offered no proof to corroborate their statement that the area surrounding 176th Street and St. Nicholas Avenue is a known hub for the drug trade. *See* Tr. at 5.

**13.** I would add that although Officer Carroll found the out of state plate particularly relevant, I do not. In a number of the cases I read, I noted that often cars will come to New York City from New Jersey and Connecticut to purchase drugs. While I do not find this practice odd based on their proximity to New York City, I would be less inclined to suspect a car from Michigan to be here for the purpose of purchasing drugs. It is a long drive from Michigan to New York just to carry out a drug transaction and particularly when Detroit, Michigan is considered a "source city" for drug trafficking just as New York.

**14.** *Common Sense*, February 14, 1776.

picion exists. Let's look at those cases; in *United States v. Terry*, 718 F.Supp. 1181, 1183 (S.D.N.Y.1989), the defendant was driving a car with Connecticut license plates and double parked at a known drug location under police surveillance; in *United States v. Alexander*, 907 F.2d 269, 271 (2d Cir.1990), DEA agents conducting a surveillance observed a green Jaguar double parked; in *United States v. Harley*, 682 F.2d 398, 399–400 (2d Cir.1982), the defendant arrived in a car bearing Georgia license plates, and double parked outside of a known drug location under surveillance. Each of these cases is as a consequence of the surveillance easily distinguishable from the case at bar.

In fact, in *Terry* the surveillance officers "were instructed to stop cars that double parked in front of the building [under surveillance] if the occupants entered and remained inside ... for approximately 10 minutes, then departed the area." *Terry*, 718 F.Supp. at 1183. Similarly, in *Harley* surveillance officers decided to question people seen leaving the building under surveillance in an attempt to gain additional information about the drug trafficking activities inside or a means of entry into the suspected building shortly before arresting the defendant. *Harley*, 682 F.2d at 400. There was no testimony that Officer Carroll, his partner or any officers from the 32nd, 33rd or 34th precinct were involved in surveillance activities in the area on April 21, 1995.

The Government supplied several cases which they opined were the most persuasive.[15] In the majority of these cases the key element for the stop was the defendant's furtive conduct and evasive behavior or the officer's knowledge of the defendant's propensity for involvement in criminal activity.[16] There is not a scintilla of evidence to that effect here. Not only is there no evidence of furtive or evasive conduct by the defendant here, Officer Carroll testified that the defendant proceeded through the intersection of 176th Street and St. Nicholas Avenue and continued along 176th Street at a normal rate of speed and that defendant did not drive erratically. Tr. at 6–7. The defendant stated that she was aware of the officers behind her, yet she did not run the red light at St. Nicholas Avenue, nor did she take off at an excessive rate of speed once the light changed to green.

When pressed on the issue of evasive or furtive conduct, Officer Carroll admitted that while the defendant did not herself act furtively or evasively, the conduct of the males was evasive. Officer Carroll and the Government argue that the males acted in concert with the defendant and therefore the fact that at least one of the males was observed running from the scene demonstrates evasiveness. Tr. at 7–10. Conversely, the defendant stated that the males "put the two bags in [the trunk] ... handed [her] ... the

**15.** The Government cited the following cases: *United States v. Alexander*, 907 F.2d 269 (2d Cir.1990), *cert. denied* 498 U.S. 1095, 111 S.Ct. 983, 112 L.Ed.2d 1067 (1991); *United States v. Terry*, 718 F.Supp. 1181 (S.D.N.Y.1989), *aff'd without opinion*, 927 F.2d 593 (2d Cir.1991); *United States v. Harley*, 682 F.2d. 398 (1982); *United States v. Lender*, 985 F.2d 151 (1993); *United States v. Moore*, 817 F.2d 1105 (4th Cir.), *cert. denied*, 484 U.S. 965, 108 S.Ct. 456, 98 L.Ed.2d 396 (1987); *United States v. Briggman*, 931 F.2d 705 (11th Cir.1991), *cert. denied*, 502 U.S. 938, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991); *United States v. Kimball*, 25 F.3d 1 (1st Cir.1994); and *United States v. Franco–Munoz*, 952 F.2d 1055 (9th Cir.1991), *cert. denied*, — U.S. —, 113 S.Ct. 3015, 125 L.Ed.2d 705 (1993).

**16.** *See Alexander*, 907 F.2d at 271 (defendant walked from car looking around "furtively" and "checking-out" area; when leaving driver signaled for turns not made, drove at excessive speeds and ran at least two lights); *Terry*, 718 F.Supp. at 1183 (defendant made several erratic turns on 153rd Street before entering the Major Deegan Expressway where she drove fast and was observed changing lanes); *Harley*, 682 F.2d at 400 (defendant ran a red light once he was aware of the officers following him and drove on the Harlem River Drive at speeds in excess of 90 miles per hour); *Lender*, 985 F.2d at 154 (defendant continued to walk away from officer even when commanded to stop); *Moore*, 817 F.2d at 1107 (defendant observed moving away from scene of crime and building with silent alarm ringing); *Briggman*, 931 F.2d at 709 (while trying to leave parking lot, defendant drove evasively to avoid officer); *Kimball*, 25 F.3d at 7 (officer's knowledge of defendant's involvement in prior burglaries along with defendant's presence in school parking lot at midnight when rash of school burglaries had occurred was sufficient to create a reasonable suspicion); and *Franco–Munoz*, 952 F.2d at 1057 (driver of car reduced speed when overtaken by police car).

keys and [she] ... proceeded to pull off" while the males "started walking" away from the car. The defendant further stated that the males walked in the direction that she drove the car, thus if one or all of the males had run from the corner of 176th Street and St. Nicholas Avenue, surely the defendant would have seen them.

Moreover, even assuming that one or more of the males ran from the corner once they were aware of the officers' presence, it is hard to characterize this as evasive conduct.[17] Police officers, even those travelling in unmarked vehicles, are easily recognized, particularly, in this area of Manhattan. In fact, the same United States Attorney's Office which brought this prosecution enjoyed more success in their prosecution of a corrupt police officer of an anti-crime unit operating in this very neighborhood.[18] Even before this prosecution and the public hearing and final report of the Mollen Commission, residents in this neighborhood tended to regard police officers as corrupt, abusive and violent. After the attendant publicity surrounding the above events, had the men not run when the cops began to stare at them, it would have been unusual.

Finally, I turn to the issue of the duffle bags. Duffle bags are commonly and regularly used to transport things from clothing to equipment. It is far from suspicious to see people placing duffle bags into the trunk of an out of state car in the early morning. To me this behavior is innocuous and again consistent with a person leaving early in the morning on a long drive to return home to Michigan after visiting relatives in New York City.

Officer Carroll stated that the way the men were walking, their single line forma-tion, and the fact that the men did not speak or interact with the driver of the car is suspicious in and of itself. If we contrast this testimony with that of the defendant, we find that the defendant clearly stated that she was waiting in the car when the men placed the bags into the trunk and that the men handed the car keys to her *after* they placed the bags into the trunk.

There are at least two significant discrepancies at this point in the account of the events leading up to the investigative stop of defendant and I credit the defendant's version in each case. First, did one or more of the males run from the corner of 176th Street and St. Nicholas Avenue as Officer Carroll testified or did they walk away from the car and continue walking along 176th Street as defendant stated? Second, did the males place the bags into the trunk and then cross to the south side of the street without any conversation or interchange with defendant as Officer Carroll recollects or as the defendant stated, did the males place the bags into the trunk of the car and then give the defendant the keys so that she could drive the car away?

In short, I find that the defendant's conduct in the early morning on April 21st, does not give rise to a reasonable suspicion that criminal activity was afoot. Taken individually or collectively the specific facts articulated by Officer Carroll do not amount to much and are in several pivotal respects incredible when placed side by side with the contemporaneous recollection of the defendant. In short, they fail to constitute a reasonable suspicion that the defendant was engaged in criminal activity.

While an investigative stop need not be based on probable cause, it must be predicat-

17. Furthermore, if the officers found the conduct of the males to be evasive I question why the officers did not attempt to stop the males themselves or, at the very least, call for back-up assistance in locating the males.

18. The United States Attorney for the Southern District of New York spent four years investigating and prosecuting claims that officers assigned to the Washington Heights' anti-crime unit Local Motion for corruption and unjustified arrests. Greg B. Smith, "Bitter Tears at Cop Conviction", Daily News, Aug. 18, 1995. During the investi-gation Assistant United States Attorneys assigned to the case interviewed numerous individuals who aided in uncovering evidence that members of the anti-crime unit committed perjury or made false statements in connection with various arrests and the prosecution of both federal and state crimes. *See* Greg B. Smith, "NYPD to Get Feds' Info on 34th PCT.", Daily News, June 2, 1995. Meanwhile, the 34th precinct leads the city in corruption complaints filed against its officers. *See* John Marzulli, "Crooked–Cop Complaints Climb 28%", Daily News, June 16, 1995.

ed on a reasonable suspicion based on specific facts and reasonable inferences which can be drawn from those facts. *See generally Glover*, 957 F.2d at 1008. The Government urges me to reiterate my brief opinion in *United States v. Germosen*, 1995 WL 733572 (S.D.N.Y. Dec. 12, 1995), it is inapposite. There, the defendant was stopped as he exited a phone cloning operation in a building that had been under surveillance for some time and where the investigating officers had sufficient information for an intended raid at the location under surveillance and another similar enterprise. *See United States v. Germosen*, Tr. at 9–11.

Here there was no activity which, when viewed along with the other events of April 21st, rises to the level of reasonable suspicion sufficient for an investigative stop. Because I find that the initial stop of defendant's car was not justified, it follows that the subsequent search of her car, the seizure of the drugs from the trunk and defendant's post arrest statements being the fruits of a tainted search must and will be suppressed.

### III. *Conclusion*

For the reasons stated above, the defendant's motion to suppress the 34 kilograms of cocaine and 2 kilograms of heroin seized from the car she was driving at the time of her arrest and her post arrest statements is granted.

SO ORDERED.