**UNITED STATES of America**

v.

**Carol BAYLESS, Defendant.**

**No. 95 Cr. 533 (HB).**

United States District Court,
S.D. New York.

April 1, 1996.

Mary Jo White, United States Attorney for the Southern District of New York, Jay Holtmeier, David R. Lewis, Ira M. Feinberg, Matthew Fishbein, Assistant United States Attorneys, New York City, for U.S.

Ramon Pagan, Bronx, New York (Lawrence Hochheiser, Manual A. Sanchez, Jr., of counsel), for defendant.

### Decision and Order

BAER, District Judge.

Defendant Carol Bayless was charged in connection with an alleged cocaine and heroin distribution conspiracy. Defendant moved to suppress physical evidence seized from the car she was driving at the time of her arrest and her post-arrest statements. On January 3 and 4, 1996 I heard testimony and arguments from the Government and defense counsel and on January 22, 1996 I granted defendant's motion to suppress.

The Government submitted a Motion for Reconsideration and Reargument on February 6, 1996 and in a brief decision on March 5, 1996, that motion was granted. On March 15, 1996 the original hearing was reopened so that the Government and the defendant, if she so chose, could provide this Court with additional testimony. For the reasons which follow, my original decision is vacated and the motion to suppress is denied.

### I. Background

Familiarity with the facts of this case as detailed in my January 22nd opinion is assumed. *See United States v. Bayless*, 913 F.Supp. 232, 234–37 (S.D.N.Y.1996). For that reason, this Decision and Order does not contain a statement of the background facts. Portions of the background section from the January Decision and Order appear throughout this Decision and Order as do facts which emerged at the March rehearing.

## II. *Discussion*

### a. The Burden of Proof and the Burden of Persuasion.

In every legal proceeding one side bears the burden of proof. The general rule in suppression hearings is that the defendant who moves for suppression bears the initial burden. *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir.1980) (citations omitted); *United States v. Levasseur*, 618 F.Supp. 1390, 1392 (E.D.N.Y.1985); *United States v. Collins*, 863 F.Supp. 165, 169 (S.D.N.Y.1994); *United States v. Chavis*, 48 F.3d 871, 872 (5th Cir.1995). The defendant must present a *prima facie* case showing a Fourth Amendment violation, i.e., that a government official, acting without a warrant, subjected her to either an arrest or a search and seizure.[1] *Arboleda* 633 F.2d at 989; *Levasseur*, 618 F.Supp. at 1392; *Chavis*, 48 F.3d at 872. Once the defendant has met this burden, however, the burden shifts and the law requires the Government to justify its intrusion on the defendant's Constitutional rights. *Arboleda*, 633 F.2d at 989. Thus, "[w]hen it has acted without a warrant, the ultimate burden of persuasion is then upon the government to show that its evidence is not tainted." *United States v. Bonilla Romero*, 836 F.2d 39, 45 (1st Cir.1987) (citing *Alderman v. United States*, 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176 (1969)).

Unlike in other criminal proceedings, the standard of proof in suppression hearings is not proof. beyond a reasonable doubt but is the standard used in most civil cases, a preponderance of the credible evidence. *United States v. Matlock*, 415 U.S. 164, 177, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974); *Levasseur*, 618 F.Supp. at 1392; *Collins*, 863 F.Supp. at 169 n. 2. This standard requires the Government to demonstrate that it is more likely than not that Sergeant Bentley and Officer Carroll had a reasonable and articulable suspicion that the defendant was engaged in criminal activity when they stopped her vehicle. As I regularly instruct juries in civil litigation, if the credible evidence on an issue is evenly divided between the parties and it is equally probable that one side is as right as the other, the issue must be decided against the party bearing the burden of proof, generally the plaintiff. However, so long as the scales tip, however slightly, in favor of the plaintiff, the plaintiff has shouldered its burden of proof and you must find accordingly.

In my initial opinion, I determined that the Government failed to carry its burden both in the sufficiency of the proof provided to the Court and its persuasiveness. *Bayless*, 913 F.Supp. at 234, 239–40. Specifically, the Government failed to carry its burden on two fronts used by Courts to determine whether it has passed the requisite test for a valid "Terry" stop. First, it did not present an adequate and persuasive picture of the narcotics trafficking activity where the events of April 21, 1995 occurred, and second, and more importantly, it failed to provide persuasive and corroborated testimony about one or more of the events leading up to the arrest of the defendant. Added to this were significant factual contradictions between Officer Carroll's testimony and Ms. Bayless' videotaped confession.

### b. Credibility.

As is apparent from my earlier opinion and the recent rehearing, this case turns, as many do, on the issue of credibility. It is always the factfinder's role to assess and evaluate the credibility, or lack thereof, of each witness presented. If this had been a jury trial, credibility would have been a major factor in any juror's decision. Since reasonable men and women may differ as to the credibility of a witness, jury deliberations frequently go on for long hours and sometimes even for days or weeks. However, because suppression hearings thrust the

---

**1.** The typical threshold inquiry for any Fourth Amendment claim is standing, i.e., whether or not the defendant who moves for suppression has standing to object to the government's search. *See generally Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *see also United States v. Osorio*, 949 F.2d 38, 40 (2d Cir.1991) (defendant must establish violation of Fourth Amendment rights by challenged search and seizure by demonstrating that he had right to privacy in cab). Because the Government does not challenge the defendant's standing to assert her Fourth Amendment rights here, I do not address this point.

Court into the role of both factfinder and law giver, credibility in this case is an issue which remains with the Court.

When I instruct jurors in how to assess credibility, I tell them to decide where the truth lies, to make judgments on the basis of all of the testimony of each witness, the circumstances under which each witness testified, and any other matter in evidence which may help them decide which witnesses are credible and which witnesses are not. As factfinder I apply this same analysis to the witnesses before me.[2]

For those who may take the time to read this decision, a word about the law and how it regards the issue of credibility may be helpful. Determinations of credibility are reviewed only for an abuse of discretion; "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), (*citing, e.g., United States v. Yellow Cab Co.,* 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949)). A factfinder's credibility determination is given considerable weight, and his decision "to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence ... can virtually never be clear error." *Anderson,* 470 U.S. at 575, 105 S.Ct. at 1512 (citations omitted). Thus it becomes vital that judges take credibility into serious consideration, as I did and as every judge charges their juries to do when they are the factfinders.

At the initial hearing, there was basically a single witness to the occurrence, Officer Carroll, along with the videotaped confession introduced by the Government. Since the Government proffered the tape and because application of the Federal Rules of Evidence is relaxed during suppression hearings, the Court utilized the videotape in making its decision. *See* Fed.R.Evid. 104(a), 1101(d)(1); *see also United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

Let us look for a moment at those two witnesses. Each painted a different picture and their testimony went into the balancing process used to determine credibility. First, Officer Carroll testified that he observed the defendant driving eastbound on West 176th Street, Jan. Tr. at 5; *Bayless,* 913 F.Supp. at 239. The defendant, however, maintained that she did not drive to New York City from Detroit and that she did not begin to drive the Red Caprice until after the narcotics were placed in the trunk. Videotaped Statement; *Bayless,* 913 F.Supp. at 239. Second, according to the defendant's videotaped statement, she waited for a ten minute period double parked outside of an apartment building on West 176th Street while the dealers took the money out of the trunk and went inside to complete the transaction. Videotaped Statement; *Bayless,* 913 F.Supp. at 236–37. Officer Carroll testified that he observed the defendant as she drove along West 176th Street and then pulled over, stopped the car and double parked on the north side of the street. Jan. Tr. at 5. Noticeably absent from Officer Carroll's testimony was the ten minute period after the car stopped and during which time the men took the money out of the trunk and into the building.

Third, Officer Carroll testified that he observed at least one of the males running from the scene. Jan. Tr. at 7–10; *Bayless,* 913 F.Supp. at 241. In marked contrast, the defendant stated in her videotaped statement that as she proceeded to drive to the corner of 176th Street and St. Nicholas Avenue, she saw the males walk, not run, in the same direction as she was driving. Videotaped Statement; *Bayless,* 913 F.Supp. at 241–42. Fourth, Officer Carroll testified that he did

---

2. A factfinder is to:
   scrutinize the testimony given and the circumstances under which each witness has testified, ... [c]onsider each witness' intelligence, his motives, state of mind, his demeanor and manner while on the witness stand.... All evidence of a witness whose *self-interest is shown* from either benefits received, detriments suf-

fered, threats or promises made, or any attitude of the witness which might tend to prompt testimony either favorable or unfavorable to the accused should be considered with caution and weighed with care.
*Hoffa v. United States,* 385 U.S. 293, 312 n. 14, 87 S.Ct. 408, 419 n. 14, 17 L.Ed.2d 374 (1966).

not observe any conversation or contact between the defendant and the males at or about the time the bags were placed in the trunk. Jan. Tr. at 6; *Bayless*, 913 F.Supp. at 235. The defendant stated that after the males placed the duffle bags in the trunk, they handed her the keys to the car so that she could begin her trip home. Videotaped Statement; *Bayless*, 913 F.Supp. at 237.

The law for a Terry-type investigative stop requires only a specific and articulable suspicion, a significantly lesser standard than the probable cause requirement. Accordingly, any inquiry into the reasonableness of an officer's suspicion is totally dependent on the factfinder crediting the testimony of the witnesses. Because of the disparate stories presented and as well the lack of cogent evidence with respect to the character of the neighborhood,[3] I concluded that the Government had failed to carry its burden. Thus, the defendant's motion was granted.

At the second hearing, the Government produced not only the other officer who observed the events at issue here, but also the report he prepared hours after the arrest for the Chief of Patrol's review and which detailed the events leading to the arrest. *See* Affirm. of Sgt. Walter E. Bentley, Ex. 3504–A. The Government additionally provided two affirmations which described the drug trafficking activity in Washington Heights.[4] Furthermore, the defendant chose to take the stand. This provided the finder of fact with an opportunity to observe her demeanor generally and on cross examination in particular. As a consequence, the Court gained a more complete and more accurate picture of the events.

The rehearing provided the Court with unanimity on a number of integral issues. Sergeant Bentley's testimony corroborated several significant portions of Officer Carroll's story and presented a more credible chronology of the events of April 21st.[5] For example, Sergeant Bentley and Officer Carroll corroborated one another to the effect that they both first observed the defendant driving eastbound on West 176th Street and then watched as she pulled to the north side of the street, just shy of the corner of St. Nicholas Avenue, where she double parked. *Compare* March Tr. at 13–14; Jan. Tr. at 5. Both officers observed four males loading two large duffle bags into the trunk of the car and although the officers differ as to the precision with which the trunk was loaded, there is unanimity as to the abbreviated time period in which the events unfolded, and the lack of conversation or an exchange of keys between the males and the defendant. *Compare* March Tr. at 14[6]; Jan. Tr. at

---

**3.** At the first hearing, Officer Carroll provided the Court with only vague testimony that the Washington Heights area is known "as a hub for the drug trade." *See* Jan. Tr. at 4. During Officer Carroll's testimony the following exchange took place between the Court and the witness:

THE COURT: "How large an area would you say that is?"
THE WITNESS: "It's a large area."
THE COURT: "Like a mile square?"
THE WITNESS: "Yes."

*Id.; see also Bayless*, 913 F.Supp. at 240 n. 12 ("Interestingly, the Government offered no proof to corroborate their statement that the area surrounding 176th Street and St. Nicholas Avenue is a known hub for the drug trade.")

**4.** From the affirmations submitted without objection at the rehearing, it has now been shown that the area of Manhattan about which we are concerned and, in particular the portion of Washington Heights nearest to the George Washington Bridge, is known amongst law enforcement officers as a significant center of narcotics trafficking. *See* Aff. of James F. Cerven at 4–5. Drug traffickers are attracted to this area we learn both because of its proximity to inter- and intrastate roadways and the price of drugs which is typically lower there than in other parts of the country. *Id.* at 5. Thus, both low-level and high-level dealers are known to frequent this area of New York City solely for the purpose of purchasing large quantities of narcotics for personal use and distribution elsewhere. *Id.* at 5–6; *see also* March Tr. at 13.

**5.** Parenthetically, I would note that the Court had been concerned about the way the Sergeant might be prepared for his testimony. His testimony demonstrated that the United States Attorney's Office used, as usual, commendable care and restraint in this regard.

**6.** Sergeant Bentley testified that:

as the car pulled over, the trunk almost simultaneously opened up, and I saw four men at the back of the car. . . . one of the men opened the door of the trunk the rest of the way and he threw in two duffle bags . . . [which] made a bang sound when they hit the bottom of the trunk.

6.[7] Finally, both officers observed at least one male, if not more, running from the scene once the duffle bags were placed in the trunk and the males had noticed the officers. *Compare* March Tr. at 15–16,[8]; Jan. Tr. at 7.[9]

The Court found Sergeant Bentley to be a credible witness which bolstered the credibility of his partner.[10] In contrast, as a conse-

. . . .
there was no communication [between the males and the driver].
March Tr. at 14–16.

7. Officer Carroll testified that:

As soon as the auto stopped, I observed four males come from the south sidewalk between parked autos. They entered the street in a single file-like walk to the rear of the auto. I saw just before they reached it the driver of the auto lean over into the passenger side of the car. The trunk opened a few inches. The first male opened the trunk. The next male came and through [sic] a duffle bag, a large black duffle bag into the back. Another large male was also carrying a black duffle bag, and he threw that into the back. The fourth male came and closed the trunk.
Jan. Tr. at 6.

8. Sergeant Bentley testified that:

we pulled up into roughly the area where that car had double parked and I looked to my left and I saw two of the males that had loaded the car were standing there and they were talking, and they looked at myself and Officer Carroll, and the men stopped the conversation and ran. One of the men ran eastbound on 176th Street and then northbound on St. Nicholas Avenue, and the other male ran in the direction we came in, westbound on 176th Street.
March Tr. at 15–16.

9. Officer Carroll testified as follows:

I then moved east on the avenue behind it [defendant's car], stopped before getting very close to her, to where the males were on my left, on the north side of the street. They were standing on the sidewalk. I stopped. Myself and Sergeant Bentley were staring at them. There came a point where at least two of the males noticed us, looked at us. They spoke very briefly to each other. . . . At that point the four males moved in different directions at a rapid gait. The individual that I watched went to the corner of 176th Street and St. Nicholas Avenue, and as he reached the corner began to run northbound on St. Nicholas.
Jan. Tr. at 7.

10. The Court regrets that the Government did not conclude to put the Sergeant on the stand at the January hearing.

quence of the defendant's testimony and that of the Sergeant, her story is now less convincing.[11] Although I previously accepted the defendant's version based on the video-taped confession, the additional evidence has necessarily changed my view. In short, the Government and the defendant both provided this Court with more evidence and upon review, the Government's version is more credible.

11. There are a number of inconsistencies between Ms. Bayless' recitation of events on videotape and her testimony in Court. For example, in Court Ms. Bayless testified that while she sat outside of the apartment building and the men were inside purchasing the narcotics, she saw Officer Carroll drive by her at least three times and that on the second time around, she waved at the officer; "I seen Officer Carroll when he past me. And he was looking at me, and he went on. . . . two or three minutes he was back again and he was—he passed me again. . . . And this time I waved because I was a little nervous." March Tr. at 68–19. Yet, in her videotaped confession, Ms. Bayless did not mention seeing Officer Carroll until after he pulled her over and approached her. *See* Videotaped Statement. Additionally, Ms. Bayless testified that while she was waiting, she had a cellular phone with her as did the men inside the building but that she chose not to use it. March Tr. at 89–90. This Court finds it unbelievable that if the police continued to pass her car that she would have failed to call the men inside to warn them or suggest that they not bring the narcotics down to the car. *Id.*

By means of a second example, Ms. Bayless testified on the witness stand that while she waited for the traffic light to change from red to green at the corner of 176th Street and St. Nicholas Avenue, with Officer Carroll and Sergeant Bentley in the car behind her, a yellow cab drove up behind both vehicles and began to honk its horn once the light changed color. In marked contrast, Ms. Bayless' videotaped confession contains no mention of a yellow cab. March Tr. at 72–73.

As a third example, Ms. Bayless stated on videotape that she was not promised anything in exchange for her statement, *see* Videotaped Statement; *see also Bayless*, 913 F.Supp. at 236 n. 8, but while on the stand Ms. Bayless claimed that she was told that she could go home if she cooperated with the officers who questioned her. March Tr. at 94–95.

Another example of how her credibility was impaired is her testimony before this Court that the officers who questioned her at the time of her arrest repeatedly stopped the videotape if she did not provide them with a satisfactory answer. Affirm. of Carol Bayless at 3; March Tr. at 99. However, a video technician performed tests on the videotape which indicate that the videotape was not stopped after the interview began and before it was concluded. March Tr. at 97.

#### c.  The Investigative Stop is Valid.

The standards for a Terry-type investigative stop and what qualifies as a reasonable search and seizure under the Fourth Amendment were spelled out in detail in the January 22, 1996 Decision and Order of this Court, *Bayless,* 913 F.Supp. at 238–39, and also appear in the progeny of caselaw on this issue.

Looking at the totality of the circumstances, as I must, the facts now established satisfy the test commonly applied by the Courts: "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (*quoting Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Officer Carroll and Sergeant Bentley together have articulated sufficient facts to create a reasonable suspicion that the defendant was involved in criminal activity when they made the decision to stop her car. Therefore, the investigative stop of the defendant in this case was valid.

Let me emphasize that I limited my inquiry to the investigative stop. *Bayless,* 913 F.Supp. at 238. In my view, once the officers established that the defendant violated New York's Vehicle and Traffic Law, they were entitled to arrest her, impound her vehicle, and consistent with department procedures, conduct an inventory search of the car. *See* Jan. Tr. at 15; N.Y. Penal Law § 165.05 (McKinney 1995).

#### d.  Additional Thoughts.

A legal opinion stands for a proposition of law, a holding. Additional material which is included in most opinions but which does not relate directly to the holding is known as dicta. Although dicta may color the holding of an opinion, it by no means constitutes a legal or factual conclusion. On that score, unfortunately the hyperbole (dicta) in my initial decision not only obscured the true focus of my analysis, but regretfully may have demeaned the law-abiding men and women who make Washington Heights their home and the vast majority of the dedicated men and women in blue who patrol the streets of our great City.

In this Decision and Order the Court has stated its basis for vacating its prior ruling and, although the Court has now determined that the Government shouldered its burden, the Government's success did not come easily. The facts of this case have consistently danced the fine line between a valid search and seizure so essential to the Government's criminal justice initiative and a trespass on citizens' rights. While it is clear that the Fourth Amendment operates to protect all members of our society from unreasonable searches and seizures, it is equally as unclear whether this protection exists to its fullest extent for people of color generally, and in inner-city neighborhoods in particular.

This Court and others will continue fearlessly to draw the line that separates "investigatory stops supported by 'specific, objective facts' from those stops occurring essentially at the 'unfettered discretion of officers in the field.'" *United States v. Buenaventura–Ariza,* 615 F.2d 29, 31 (2d Cir.1980) (quoting *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979)). For as Justice Marshall warned:

> Because the strongest advocates of Fourth Amendment rights are frequently criminals, it is easy to forget that our interpretations of such rights apply to the innocent and the guilty alike.[12]

### III.  *Conclusion*

For the foregoing reasons, the January 22, 1996 Decision and Order of this Court is VACATED. The defendant's motion to suppress both the physical evidence seized from the vehicle she was driving at the time of her arrest and her post arrest statements is DENIED. The parties are to contact my Courtroom Deputy within 72 hours of receipt of

---

**12.** *United States v. Sokolow,* 490 U.S. 1, 11, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989) (Marshall, J., dissenting) (*citing Illinois v. Gates,* 462 U.S. 213, 290, 103 S.Ct. 2317, 2359, 76 L.Ed.2d 527 (Brennan, J., dissenting)).

this decision to set a date for the next step in this litigation.

SO ORDERED.