**UNITED STATES of America,**
**Appellee,**

v.

**Carol BAYLESS, Defendant–Appellant.**

**Docket No. 98–1580**

United States Court of Appeals,
Second Circuit.

Argued: June 25, 1999.

Decided: Jan. 18, 2000.

Tracy W. Young, Madison, NJ (Joyce C. London, New York, NY, on the brief), for Defendant–Appellant.

Ira M. Feinberg, Assistant United States Attorney, on behalf of Mary Jo White, United States Attorney for the Southern District of New York (Jay Holtmeier, Special Assistant United States Attorney, and Boyd M. Johnson III and Lewis J. Liman, Assistant United States Attorneys, on the brief), for Appellee.

Gerald Walpin and Steven M. Edwards, Federal Bar Council, New York, NY, submitted a brief (Barrie Goldstein and Russell L. Penzer, on the brief), for amicus curiae Federal Bar Council.

Before: CALABRESI and PARKER, Circuit Judges, and TRAGER, District Judge.*

CALABRESI, Circuit Judge:

In this appeal from a conviction of narcotics offenses, defendant-appellant Carol Bayless argues that the district judge (Harold Baer, Jr., *J.*) who presided over a pretrial suppression hearing was obliged to recuse himself in the interest of the appearance of justice. Judge Baer's original decision to grant Bayless's motion to suppress drugs seized from her car was fiercely criticized by politicians and press alike, some of whom called for his impeachment. In the midst of the furor over his ruling, Judge Baer granted the government's motion for reconsideration of his decision, reopened the suppression hearing and heard significant new evidence, and then denied the motion to suppress. After the motion to suppress was denied, Bayless moved for Judge Baer's recusal.

We conclude that the most difficult issues potentially raised by this remarkable case need not be decided. Thus, we do not determine when, if ever, criticism of an unpopular decision becomes so severe as to constitute grounds for recusal of the judge who made that decision. Similarly, we do not establish the conditions under which a

---

* Honorable David G. Trager, of the United States District Court for the Eastern District of New York, sitting by designation.

defendant who waits to move for a judge's disqualification until after that judge has ruled against her may totally waive her right to seek recusal. Finding, simply, that in the circumstances of this case, Judge Baer did not commit plain error in failing to recuse himself *sua sponte,* and further finding that Judge Baer did not err when, after hearing all the relevant evidence, he concluded that the drugs seized from Bayless's car were properly admissible against her, we affirm Bayless's conviction.

## BACKGROUND

### A. Bayless's Arrest and the Search of Her Car

The story begins on April 21, 1995, the day of Bayless's arrest. The parties agree that the arresting police officers, Officer Carroll and Sergeant Bentley, were patrolling the Washington Heights area of Manhattan in an unmarked police car when they observed Bayless, in a car with Michigan license plates, double-parked on 176th Street, near St. Nicholas Avenue. While Bayless was stopped, the officers saw four men load two heavy duffel bags into the trunk of her car. Almost immediately, the men stepped away from the car, and Bayless drove off alone. The officers followed Bayless for about two blocks, during which time she did not drive erratically or commit any traffic violations. They nevertheless pulled her over. After discovering that the car was a rental car and that Bayless was not an authorized driver, the officers asked her about the bags that had been placed in her trunk. When Bayless denied knowledge of the bags, they asked her for the keys, opened the trunk, and discovered that the bags contained a large quantity of cocaine, along with some heroin. (The exact amount of each was later determined to be thirty-four kilograms of cocaine and two kilograms of heroin.)

Bayless was arrested and taken to the 33rd Precinct, where the case was turned over to federal authorities. After being read her *Miranda* rights, Bayless was interviewed by federal agents and confessed to acting as a drug courier for her son, who sold drugs in the Detroit area. She then repeated her statement on videotape. On June 21, 1995, Bayless was indicted by a grand jury in the United States District Court for the Southern District of New York. She was charged with possession of cocaine and heroin with intent to distribute, in violation of 18 U.S.C. § 2 (1994) and 21 U.S.C. § 812, § 841(a)(1) and § 841(b)(1)(A) (1994), and with conspiracy to distribute cocaine and heroin and possess them with intent to distribute, in violation of 21 U.S.C. § 846 (1994). Her case was assigned to Judge Baer.

### B. The January 1996 Suppression Hearing

On October 3, 1995, Bayless moved to suppress the drugs seized from her car and her post-arrest statements on the ground that the police did not have reasonable suspicion to stop her car. In early January, 1996, Judge Baer held a suppression hearing, at which the government introduced the testimony of one of the arresting officers, Officer Carroll, and the court viewed the videotaped statement Bayless gave after her arrest.

At the hearing, Officer Carroll testified that on the morning of April 21, he and his partner, Sergeant Bentley, both members of the Street Crime Unit, were in plain clothes, patrolling Washington Heights in an unmarked police car. At about 5 a.m., the officers entered 176th Street, and observed a 1995 Chevrolet with Michigan license plates moving slowly along the street. The officers saw the car pull over to the north side of the street, near the intersection with St. Nicholas Avenue, and double park. At that time, Officer Carroll could not tell who was driving the car, but could tell that there was no passenger. As soon as the car stopped, four men came from between parked cars on the south side of the street. Walking in single file, they crossed the street and approached

the Chevrolet. Just before the men reached the car, the driver leaned over to the passenger side of the car, and the trunk opened a few inches. The first of the four men opened the trunk all the way, the second man put a large duffel bag into the trunk, the third man put a second large duffel bag into the trunk, and the last man closed the trunk. There was no conversation or other interaction between the four men and the driver, and the entire transaction was concluded in seconds.

After the trunk was shut, the driver immediately drove away, stopping at a red light at the intersection. The officers followed the car, stopping opposite the four men, who were standing on the sidewalk on the north side of 176th Street. Officer Carroll testified that at least two of the men noticed him and his partner and spoke briefly to each other (he could not hear what they said) and that the four men then moved rapidly in different directions. Officer Carroll watched one of the men, who walked to the corner and then began to run north on St. Nicholas Avenue.

The officers followed the Chevrolet and, after about two blocks, placed a red flashing light on their dashboard and pulled the car over. After stopping the car, Officer Carroll ordered Bayless to turn the motor off, which she did, and asked her for her license, registration, and insurance. Bayless told Carroll that it was a rented car, and he asked for the rental agreement and her license, which she gave him. When he asked her to whom the car was rented, she said she did not know. The rental agreement was not in Bayless's name, and it did not authorize any other drivers. Officer Carroll asked Bayless who the men who had put bags in her trunk were, and she denied that anyone had put bags in her trunk. He then asked Bayless to get out of the car and, handcuffing her, arrested her for unauthorized operation of a motor vehicle. After the arrest, Sergeant Bentley unlocked the trunk, opened the duffel bags, and found the drugs. The officers then took Bayless to the 33rd Precinct.

Upon questioning by the court, Officer Carroll gave several reasons why he and his partner were suspicious of Bayless. First, Officer Carroll claimed that the area around 176th Street, and the Washington Heights/Inwood neighborhood in general, was "known as a hub ... for the drug trade." Second, the "orchestrated" manner in which the four men loaded the trunk suggested to Carroll a rehearsed transaction, and he found it abnormal and suspicious that the four men had no conversation or interaction with the driver of the car. Third, the men dispersed upon spotting the officers, and one of them began to run. Fourth, the car had out-of-state license plates. Finally, Officer Carroll noted that he and his partner pulled Bayless over when they did because they wanted to prevent her from reaching the highway, which led to the George Washington Bridge and thence out of New York state.

At the hearing, the court also viewed Bayless's videotaped statement, which described the events surrounding her arrest in a somewhat different fashion. According to Bayless, she left Detroit on the afternoon of April 20 with five duffel bags full of cash (she estimated the total to be about $1 million), planning to purchase drugs in New York and to bring them back to Detroit. She was a passenger in the Chevrolet, which was driven by an associate, Terry, and they were accompanied by three other men driving a van (Robert, Chubb, and another man whose name she could not remember). When they reached 176th Street, where they were met as planned by the people selling them the drugs, Terry double-parked and got out of the car and went to move the van. The other men took the money out of the trunk of the Chevrolet and went into an apartment building to exchange the cash for drugs. Bayless waited in the car for about ten minutes, until the men returned. The men put two duffel bags containing drugs in the trunk of the car, and handed her the keys. Bayless then drove by herself down 176th Street, and saw Robert and Chubb

walking in the same direction that she was driving. Bayless stopped for a red light at the corner of St. Nicholas Avenue, proceeded for a short distance until she saw the flashing red light in the police car and pulled over. She waited until the police officers got out of the car; they asked her for her license and registration, which she gave them. When they asked her what was in the trunk, she responded that she did not know. The officers asked for her keys and opened the trunk, and arrested her.

### C. Judge Baer's Decision of January 22, 1996

After hearing Officer Carroll's testimony and viewing Bayless's videotaped statement at the hearing, Judge Baer on January 22 issued a ruling suppressing the cocaine and heroin seized from Bayless's car, along with her post-arrest statements. *See United States v. Bayless*, 913 F.Supp. 232, 243 (S.D.N.Y.1996). Judge Baer began by noting that Officer Carroll's testimony and Bayless's videotaped statement "differ[ed] dramatically," and that, given its inculpatory nature, he found Bayless's statement more credible. *Id.* at 234. He pointed out that if Bayless was telling the truth, "Officer Carroll apparently missed or overlooked the fact that the car had come to a halt, never saw the man exit the [car], and missed the million dollars being taken out of the trunk," making his version "incredible." *Id.* at 239–40. Judge Baer also asked rhetorically where the officer in charge, Sergeant Bentley, was during the suppression hearing: "[w]hile presumably available to corroborate [Officer Carroll's] gossamer," the judge commented, "he was never called to testify." *Id.* at 239.

Judge Baer highlighted two major disparities between Officer Carroll's testimony and Bayless's statement: first, Carroll testified that one of the men ran from the scene, while Bayless stated that they all walked away; and, second, Carroll testified that the men had no conversation or other interaction with Bayless, while Bayless said that they gave her the car keys after loading the bags into the trunk. *See id.* at 237, 239, 241–42. Judge Baer made it clear that he credited Bayless's version on both counts. *See id.* at 242. He found that the remaining facts articulated by Carroll—the "high-crime" neighborhood, the early morning hour, the out-of-state license plates, the duffel bags, and the double parking—did not, without more, give rise to reasonable suspicion, and he therefore suppressed the seized drugs and Bayless's post-arrest statements. *See id.* at 242–43.

Judge Baer's holding rested on the conclusion that Bayless's account was more credible than Officer Carroll's, and that the men loading the bags into her trunk had not run away upon seeing the officers. In dicta, however, he went on to say that even had one or more of the men run away, "it [would be] hard to characterize this as evasive conduct." *Id.* at 242. In the passage of his opinion that subsequently drew the most fire from critics, he added:

> Police officers, even those travelling in unmarked vehicles, are easily recognized, particularly, in this area of Manhattan. In fact, the same United States Attorney's Office which brought this prosecution enjoyed more success in their prosecution of a corrupt police officer of an anti-crime unit operating in this very neighborhood. Even before this prosecution and the public hearing and final report of the Mollen Commission, residents in this neighborhood tended to regard police officers as corrupt, abusive and violent. After the attendant publicity surrounding the above events, had the men not run when the cops began to stare at them, it would have been unusual.

*Id.* (footnotes omitted).

### D. The Publicity Following Judge Baer's January 22, 1996 Ruling

Judge Baer's ruling immediately drew heavy criticism in the press and from local

political figures, including New York's Mayor and Police Commissioner, as well as Governor George Pataki. *See* Chester L. Mirsky, *The Exclusionary Rule Was Appropriately Used,* Nat'l L.J., Feb. 26, 1996, at A21. The decision itself, and the language in the opinion, referring as it did to widespread police corruption, was perceived by many as an affront to the police and to victims of drug-related crime. An editorial in the *New York Times* called Judge Baer's decision "judicial malpractice," and accused him of "undermin[ing] respect for the legal system, encourag[ing] citizens to flee the police and deter[ring] honest cops in drug-infested neighborhoods from doing their job." *Judge Baer's Tortured Reasoning,* N.Y. Times, Jan. 31, 1996, at A16.

In February, the government filed a motion for reconsideration of the order granting the suppression motion. The decision, however, continued to attract attention and quickly became the focus of a nationwide controversy and a flashpoint for the 1996 Presidential campaign, as Democrats and Republicans competed to enhance their reputations as proponents of law and order by denouncing Judge Baer. In early March, more than two hundred members of Congress, led by Republican Representatives Bill McCollum, Fred Upton, and Michael Forbes, sent a letter to President Clinton calling Judge Baer's ruling "a shocking and egregious example of judicial activism." Jon O. Newman, *The Judge Baer Controversy,* 80 Judicature 156, 156 (1997). The letter claimed Judge Baer had "sid[ed] with drug traffickers and against hard-working police officers and the frightened residents of violence-ridden communities," and that he had "demonstrated a level of ideological blindness that render[ed] him unfit for the proper discharge of his judicial duties." *Id.* The writers asked President Clinton to join them in calling for Judge Baer's resignation. *See id.* at 157.

When asked about the letter at a White House press conference, President Clin-ton's spokesperson Mike McCurry said that the President would defer deciding whether to call for Judge Baer's resignation until the Judge ruled on the government's motion for reconsideration, adding that, while the President would evaluate Judge Baer's record "on the full breadth of his cases," the White House was "interested in seeing how he rules" in response to the motion. *Id.* The press interpreted McCurry's comment as a veiled warning. For example, the *New York Times* reported that "[t]he White House put [Judge Baer] on public notice today that if he did not reverse a widely criticized decision throwing out drug evidence, the President might ask for his resignation." Alison Mitchell, *Clinton Pushing Judge to Relent,* N.Y. Times, Mar. 22, 1996, at A1. Subsequently, in a written response to Rep. McCollum, the White House disavowed any intent to ask for Judge Baer's resignation, saying that the issues should be resolved in the courts. *See* Newman, *The Judge Baer Controversy, supra,* at 160. Then–Senate Majority Leader and Presidential candidate Bob Dole joined the fracas by saying that if Judge Baer did not resign, he should be impeached. *See id.*

### E. The Hearing of March 15, 1996

In February, and well before the furor had died down, Judge Baer presumably began to consider the government's motion asking him to revisit his ruling. On March 5, he granted the government's motion to reopen the hearing for the presentation of additional evidence—specifically testimony by Sergeant Bentley that would corroborate Officer Carroll's earlier testimony.

At the hearing on March 15, Sergeant Bentley testified to the events surrounding the arrest. He confirmed Officer Carroll's account that the loading of the trunk appeared "orchestrated" and that there was no communication between the men and the driver of the car. He also confirmed Officer Carroll's statement that he had seen one of the men who had loaded the trunk run away. In fact, Sergeant Bentley

claimed to have seen *two* of the men run away: one, he said, ran east on 176th Street and then north on St. Nicholas Avenue, while the other ran west on 176th Street.

Carol Bayless again testified about the events surrounding her arrest. Her account now included some details not present in her videotaped statement; for example, on cross-examination, Bayless for the first time said that she had a cellular phone with her in the car, with which she could have contacted the men who had made the trip with her, who also had a cell phone. Bayless continued to claim that she had seen the men walk toward the corner after they loaded the bags into her car, and denied seeing them run. She conceded, however, that she would not have been able to see what they did after turning the corner. On cross-examination, Bayless insisted that she was alone in the car for ten minutes without the keys while her companions were getting the drugs, and that she did not open the trunk, but that the men had opened it with a key. She also claimed that while her confession was being videotaped, the police coached her on what to say, and stopped and started the videotape when her answers did not satisfy them.

### F. Judge Baer's Decision of April 1, 1996

On April 1, Judge Baer vacated his earlier order suppressing the seized drugs and Bayless's post-arrest statements. *See United States v. Bayless,* 921 F.Supp. 211, 212 (S.D.N.Y.1996). He emphasized that he had not changed his evaluation of the evidence presented by the government at the earlier hearing, which he still found to be legally insufficient. *See id.* at 213. The testimony presented at the second hearing, however, had changed his mind as to the relative credibility of the police officers and Carol Bayless. *See id.* at 216.

Judge Baer found that Sergeant Bentley's testimony at the rehearing strongly corroborated Officer Carroll's account:

both said that they had first observed Bayless driving east on 176th Street and briefly double-parking while the drugs were loaded into her car; both said that there was no conversation or exchange of keys between the men and Bayless; and both said that at least one of the men ran from the scene. *See id.* at 215–16 & nn. 6–9. Judge Baer also found that the affirmations now submitted by the government supported the assertion that the area around 176th Street and St. Nicholas Avenue, in part because of its proximity to the George Washington Bridge, was a hub for drug transactions. (In his earlier opinion, he had noted that the government had not provided any evidence to back up this claim. *See id.* at 215 & nn. 3–4.)

Judge Baer concluded, moreover, that, for several reasons, Carol Bayless's testimony at the second hearing made her story less credible. *See id.* at 216 & n. 11. For example, Bayless testified that she had a cellular phone with her in the car but that she did not use it to contact the men, even though she had supposedly seen the police car pass her while she was waiting for the men to bring the drugs down to the car—an account that Judge Baer called "unbelievable." *See id.* at 216 n. 11. In addition, she stated that while she was being videotaped, the officers questioning her repeatedly stopped and started the videotape if she did not answer to their satisfaction, a claim that was not credible in light of the testimony of a video technician who examined the tape and said that it had not been stopped once the interview began. *See id.*

Taking into account the newly presented evidence, and crediting Sergeant Bentley and Officer Carroll's account over that of Bayless, Judge Baer determined that the government had now met its burden of articulating facts sufficient to give the police reasonable suspicion to stop Bayless's car. *See id.* at 217. He closed by apologizing for the controversial dicta in his earlier opinion:

[U]nfortunately the hyperbole (dicta) in my initial decision not only obscured the true focus of my analysis, but regretfully may have demeaned the law-abiding men and women who make Washington Heights their home and the vast majority of the dedicated men and women in blue who patrol the streets of our great City.

*Id.*

### G.  Bayless's Recusal Motions

On April 12, counsel for Bayless made an oral motion that Judge Baer recuse himself from further proceedings in the case, arguing that "because of the high profile or the type of publicity that this case has received, and . . . meddlers from the outside public concerning this matter, there seems to be . . . an appearance of impropriety in the way the decision was done."  He pointed out that the calls for Judge Baer's resignation or impeachment created the appearance that the judge "may have been influenced by outside forces" in his April 1 decision to deny the motion to suppress.

Judge Baer denied the motion for recusal from the bench, saying:

[T]he time to have [moved for recusal] would have been between the date of the rehearing and the decision, or earlier.

Regardless of the fact that you failed to raise the issue, I considered it carefully while the matter was pending.  Indeed, several friends whom I respect and admire made just such unsolicited suggestions. . . .

I concluded that the proper and intellectually honest approach was to continue, feeling that recusal would have certainly been easier for the court.  Even where outside influence was never a part of my thinking, which is indeed the fact here, in my view not recusing myself was the far more appropriate path for a federal judge to follow for three different reasons:

First, to be swayed by outside influence would run counter to the central theme of judicial independence.  You or your client, may not understand—and you are not alone—this position of United States District Court judge comes with life tenure.  And no one, not even the President of the United States, can take it away unless, as one great Southern District judge—I think Tom Murphy—said, "They find your hand in the cookie jar."

. . .

So, you may rest assured that while I was surprised at the fire storm that developed . . . to me the fallout constituted little more than political posturing—some of what I saw I cannot say I am proud of—but political posturing in an election year, nevertheless.  And it was in that fashion that I regard it and continue to regard most of the rhetoric I read . . . in the paper.

The second thought was that . . . it would simply be passing the buck to another jurist.  That did not seem appropriate or fair.

And, lastly, it seemed to me that it would be a significant waste of judicial time to have someone else have to go through any part of what I had done already.

On April 22, Bayless filed a written motion seeking Judge Baer's recusal, again arguing that the publicity accorded the case and the pressure put on the judge compromised the impartiality of his decision and created the appearance of impropriety.  On May 16, Judge Baer issued a written opinion denying the motion as both untimely and without merit, but requesting that the case be transferred to another district judge.  *See United States v. Bayless*, 926 F.Supp. 405, 406–07 (S.D.N.Y. 1996).

Bayless's case was transferred to Judge Robert P. Patterson, Jr., of the Southern District.  On June 21, Bayless pleaded guilty before Judge Patterson to the counts in the indictment, subject to a stipulation that she be allowed to appeal the

outcome of her suppression motion, and on October 1, 1998, she was sentenced to fifty-four months in prison.

## DISCUSSION

On appeal, Bayless argues (1) that Judge Baer was required to recuse himself *sua sponte* before deciding the government's motion for reconsideration; (2) that the failure of her counsel below to file a motion for recusal prior to Judge Baer's ruling on that motion constituted ineffective assistance of counsel; (3) that Judge Baer erred when he reopened the suppression hearing at the government's request; and (4) that Judge Baer's final disposition of the merits of her suppression motion was erroneous, because the police officers had no reasonable suspicion to stop her car on the morning of the arrest.

### A. Recusal

■ *1. The statutory scheme.*—Bayless's claim that Judge Baer should have recused himself rests on 28 U.S.C. § 455(a) (1994), which provides simply: "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." *Id.* Notably, under § 455(a), recusal is not limited to cases of actual bias; rather, the statute requires that a judge recuse himself whenever an objective, informed observer could reasonably question the judge's impartiality, regardless of whether he is actually partial or biased. *See Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 860, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). Section 455(a) complements § 455(b), which addresses the problem of actual bias by mandating recusal in certain specific circumstances where partiality is presumed. *See* 28 U.S.C. § 455(b) (requiring recusal when, *inter*

*alia,* a judge has "a personal bias or prejudice concerning a party").[1]

Section 455 was enacted in its current form in 1974, and constituted a substantial revision to the then-existing standard for recusal of federal judges. *See Liteky v. United States,* 510 U.S. 540, 546, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). While the pre–1974 law required a judge to recuse himself only when it was "improper, in his opinion, for him to sit," 28 U.S.C. § 455 (1970), thus establishing a subjective standard, § 455(a) adopts the objective standard of a reasonable observer. *See Liteky,* 510 U.S. at 548, 114 S.Ct. 1147. As a result, the judge's own subjective perception of impropriety is not necessary to invoke the statute. *See id.*

■ We have stated the standard for recusal under § 455(a) as follows:

[A] court of appeals must ask the following question: Would a reasonable person, knowing all the facts, conclude that the trial judge's impartiality could reasonably be questioned? Or phrased differently, would an objective, disinterested observer fully informed of the underlying facts, entertain significant doubt that justice would be done absent recusal?

*Diamondstone v. Macaluso,* 148 F.3d 113, 120–21 (2d Cir.1998) (quoting *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992)). The standard is "designed to promote public confidence in the impartiality of the judicial process." *SEC v. Drexel Burnham Lambert Inc. (In re Drexel Burnham Lambert Inc.),* 861 F.2d 1307, 1313 (2d Cir.1988) (quoting H.R.Rep. No. 93–1453, at 5 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6351, 6354–55) (internal quotation marks omitted). Nevertheless, the existence of the appearance of impropriety

---

**1.** In her original recusal motion below, Bayless relied on both § 455(a) and § 455(b), as well as the other major federal recusal statute, § 144, which provides for automatic disqualification of district judges when a party makes a timely and legally sufficient affidavit that the judge has "a personal bias or prejudice" against her. 28 U.S.C. § 144 (1994). On appeal, Bayless makes no claim that Judge Baer had a personal bias or prejudice against her, and relies only on the broader provisions of § 455(a).

is to be determined "not by considering what a straw poll of the only partly informed man-in-the-street would show[,] but by examining the record facts and the law, and then deciding whether a reasonable person knowing and understanding all the relevant facts would recuse the judge." *Id.*

■ Although the reach of § 455 is broad, it has significant limits. Thus, our cases state that "[d]isqualification is not required on the basis of remote, contingent, indirect or speculative interests." *Diamondstone,* 148 F.3d at 121 (quoting *United States v. Thompson,* 76 F.3d 442, 451 (2d Cir.1996)) (internal quotation marks omitted). Moreover, the legislative history of § 455 cautions that it is not intended to be "used by judges to avoid sitting on difficult or controversial cases." H.R.Rep. No. 93–1453, at 5, *reprinted in* 1974 U.S.C.C.A.N. at 6355. In the instant case, the parties do not dispute this legal standard, but differ as to whether, on the facts before us, recusal was mandated.

*2. Waiver.*—Before reaching the merits of the recusal issue, however, we must address the government's contention that, by waiting to file her recusal motion until after Judge Baer had reopened the suppression hearing and ruled against her, Bayless waived the right to appeal the denial of that motion.

■ At the outset, we pause to note a potentially confusing issue of terminology. Although the cases do not always clearly distinguish between them, "waiver and [un]timeliness are distinct issues." *United States v. York,* 888 F.2d 1050, 1055 (5th Cir.1989). Waiver is a renunciation—whether expressly through words or implicitly through behavior—of the right to seek recusal. Untimeliness, on the other hand, is merely a failure to seek recusal when it should first have been sought, that is, as soon as the facts on which it is premised are known to the parties. The confusion arises because untimeliness in making a motion for recusal can sometimes constitute the basis for finding an

implied waiver. But the distinction is a critical one, because while waiver—whether express or implied—will preclude appellate courts from entertaining a recusal claim, untimeliness need not do so. *See United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (distinguishing between "forfeiture" of a claim, which results from failure to assert the claim in a timely way, and which does not prevent an appellate court from correcting a plain error by the trial court, and "waiver," which is the "intentional relinquishment or abandonment of a known right," and which permanently extinguishes the right to raise a claim).

■ Both parties agree that there was no express waiver in this case, and Bayless concedes that her motion for recusal was untimely. The Government contends, however, that Bayless impliedly waived her recusal claim by waiting to file her motion for recusal until after Judge Baer ruled against her. We need not decide whether Bayless's failure to make a timely recusal motion below constituted implied waiver. For assuming arguendo that Bayless's failure to make a timely recusal motion below was a forfeiture and not an implied waiver of her recusal claim, we can (as the parties agree) review that claim only for plain error. And we find that Judge Baer's decision not to recuse himself *sua sponte* was not plain error.

■ *3. Plain error.*—Rule 52(b) of the Federal Rules of Criminal Procedure provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The requirements for a finding of plain error were set out in *Olano:* "There must be an 'error' that is 'plain' and that 'affect[s] substantial rights.'" *Olano,* 507 U.S. at 732, 113 S.Ct. 1770. This circuit has restated the first three prongs of the *Olano* test as follows:

First, there must be "error," or deviation from a legal rule which has not been

waived. Second, the error must be "plain," which at a minimum means "clear under current law." Third, the plain error must, as the text of Rule 52(b) indicates, "affect[ ] substantial rights," which normally requires a showing of prejudice.

*United States v. Viola,* 35 F.3d 37, 41 (2d Cir.1994) (citations omitted). Finally, even if all three of these conditions are met, the court of appeals may exercise its discretion to correct the error only if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Olano,* 507 U.S. at 732, 113 S.Ct. 1770 (quoting *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936))) (internal quotation marks omitted) (alteration in *Olano* ).

Prior to *Olano,* some courts and commentators had concluded that " 'plain error' is a concept appellate courts find impossible to define, save that they know it when they see it." *United States v. Blackwell,* 694 F.2d 1325, 1341 n. 23 (D.C.Cir. 1982) (Wald, *J.*) (quoting 3A C. Wright, *Federal Practice and Procedure: Criminal* 2d § 586, at 337) (internal quotation marks omitted). Although *Olano* has provided some guidance for lower courts in dealing with plain error, the generality of its definition may result in some important aspects of the concept—implicitly recognized in *Olano*—being neglected.

■ *Olano* states that, in order to be corrected under Rule 52(b), an error must be both clear and grave. What must also be weighed in the equation, however, is whether the party seeking relief under the plain error rule may have originally made a strategic decision not to object to the conduct now challenged on appeal. Consideration of this "strategy" factor is implicit in *Olano* 's fourth requirement—that the error seriously affect the fairness, integrity or public reputation of judicial proceedings. If a defendant makes a knowing choice to abstain from objecting to an alleged error, the probability that fairness would require correcting that error is, of course, significantly reduced.

■ But the strategy factor is also crucial to the application of the plain error test more generally. Thus, the possibility of strategic behavior is important not only in cases where the particular decision not to object to an alleged error is itself manipulative; rather, it comes into play whenever recognition of the error by a higher court would encourage such actions by future litigants. As a result, where there is no possibility of strategic manipulation, a serious error, even if relatively subtle, can be "plain error." [2] If, instead, the situation is one in which delay in objecting can be manipulative, the likelihood that the error will be deemed reversible diminishes greatly. Nevertheless, there may well be situations where a trial court's error is so grave that even a defendant's strategic choice to tolerate it cannot render it consonant with maintaining the integrity and public reputation of the judicial system.[3]

■ As we have previously intimated, it is possible that a judge's failure to recuse himself might in some circumstances fall into that category of errors. *See United States v. Yu–Leung,* 51 F.3d 1116, 1119–20 (2d Cir.1995). Because it is unnecessary to the resolution of this case, we do not now identify the situations in which

---

**2.** There will, of course, be many cases where failure to object is not likely to have been strategic. For example, it would seem unlikely that failure to preserve a claim of insufficient evidence is due to manipulation, rather than to the inadvertence or incompetence of trial counsel.

**3.** In this respect, we note that the recusal of judges—being mandated directly by statute in given circumstances, *see* 28 U.S.C. § 455— may be different from other situations involving plain error, and even waiver. For here, the legislature has spoken and expressed its determination as to what may be necessary to protect the integrity of the judicial process.

a judge's failure to recuse himself *sua sponte* would constitute plain error. We hold merely that, on the facts before us, Judge Baer's decision not to recuse himself was not plain error, in part because Bayless made a strategic choice not to move for his recusal until he had ruled against her.

In this case, Judge Baer faced a difficult choice. Confronted with unrestrained criticism from both politicians and the press, including calls for his resignation and even his impeachment, he was forced to decide whether to disqualify himself when doing so could readily have been perceived as a capitulation to political pressure—a capitulation, moreover, that might well have encouraged such pressure on judges in the future. And he was aided in making his choice neither by clear legal principles nor by a timely motion from the defendant.

The circumstances under which criticism of a judge from political figures or from the media might be grounds for recusal under § 455(a) are anything but clear. Nevertheless, many cases that have considered whether media criticism constituted grounds for recusal have found that it was not. *See, e.g., United States v. Martorano,* 866 F.2d 62, 67–68 (3rd Cir.1989) (finding no basis for recusal where a newspaper article was critical of a judge for serving as a character witness in the tax evasion trial of defendant's attorney); *United States v. Greenough,* 782 F.2d 1556, 1558–59 (11th Cir.1986) (finding a critical newspaper article insufficient grounds for recusal); *In re United States,* 666 F.2d 690, 695 (1st Cir.1981) ("Although public confidence may be as much shaken by publicized inferences of bias that are false as by those that are true, a judge considering whether to disqualify himself must ignore rumors, innuendos, and erroneous information published as fact in the newspapers. To find otherwise would allow an irresponsible, vindictive or self-interested press informant ... to control the choice of judge." (citation omitted)).

This circuit has expressly urged caution in allowing media accounts to become the focus of a recusal inquiry:

> [W]e cannot adopt a *per se* rule holding that when someone claims to see smoke, we must find that there is fire. That which is seen is sometimes merely a smokescreen. Judicial inquiry may not therefore be defined by what appears in the press. If such were the case, those litigants fortunate enough to have easy access to the media could make charges against a judge's impartiality that would effectively veto the assignment of judges. Judge-shopping would then become an additional and potent tactical weapon in the skilled practitioner's arsenal.

*Drexel,* 861 F.2d at 1309. In doing so, our court emphasized one of the serious problems with ruling that media attacks on a judge can be readily made the basis for recusal: parties who are sophisticated in their dealings with the press might then be able to engineer a judge's recusal for their own strategic reasons.

That problem obtains *a fortiori* with respect to political attacks on a judge such as those that occurred in this case. Interpreting § 455(a) to mandate *sua sponte* recusal in cases where a judge has been criticized by politicians for a controversial ruling would, in effect, confer on legislators the power to remove judges from particular cases simply by criticizing them violently. If that were so, § 455, which is intended to maintain the public image of an impartial judiciary, might—by giving politicians and the press an effective method of manipulating the judiciary—render it less impartial in actuality. Such a reading of the statute would create a moral hazard by encouraging litigants or other interested parties to maneuver to obtain a judge's disqualification. It would also contravene the legislature's intent that the statute not be used by judges to avoid sitting on controversial cases. Indeed, in the case before us, Judge Baer expressly recognized that his recusal

might have the perverse effect of "run[ning] counter to the central theme of judicial independence."

Moreover, Judge Baer was forced to make his choice at a time when Bayless had not moved for his recusal. He was thus deprived of any facts or reasoned arguments that Bayless potentially could have presented to aid him in his task of putting himself in the shoes of a disinterested but informed observer. And finally, as we have already emphasized, Bayless's failure to make a timely motion for recusal might very well have arisen from a strategic decision by her trial counsel to gamble on the outcome of the reopened suppression hearing before seeking Judge Baer's disqualification. Consequently, the principles favoring the contemporaneous objection rule weigh particularly heavily in the plain error analysis of this case. Taking all these factors into account, and despite the unusual vitriol and threats aimed at Judge Baer, we conclude that any possible error that Judge Baer may have made on the recusal issue was not close to the level of "clear" error that is required by *Olano*.

We repeat that there may well be circumstances in which no timely recusal motion is made, but in which the damage done to the appearance of justice is so egregious that, despite the moral hazard created, recusal would be warranted under § 455(a). But we need not, and therefore do not, reach the question of when such circumstances might obtain. Similarly, we express no view as to (1) whether it would have been wise for Judge Baer to recuse himself; (2) whether, if a timely recusal motion had been made below, Judge Baer would have had an obligation to recuse himself; or (3) whether, given that judges are not to use the statute to avoid sitting on difficult or controversial cases, it would have been error had he recused himself. We hold merely that, on these facts, Judge Baer's decision not to recuse himself, when he was not asked by the defendant to do so, was not plain error.

### B. *Ineffective Assistance of Counsel*

■■ Bayless next argues that her trial counsel's failure to file a timely motion for recusal constituted ineffective assistance of counsel. This argument is without merit, and, once again, the strategic nature of counsel's choice not to move for recusal in a timely fashion below is dispositive.

Under the standard established by *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in order to show ineffective assistance of counsel, a defendant must satisfy a two-part test. *See id.* at 687, 104 S.Ct. 2052. First, the defendant must show that "counsel's representation fell below an objective standard of reasonableness measured by the prevailing professional norms." *United States v. Gordon*, 156 F.3d 376, 379 (2d Cir.1998) (per curiam). Second, the defendant must show prejudice by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional performance, the outcome of the proceeding would have been different." *Id.*

Bayless cannot meet the first prong of the *Strickland* test; the performance of her trial counsel did not fall below an objective standard of reasonableness. Reviewing his conduct, as we must, *ex ante, see Strickland*, 466 U.S. at 690, 104 S.Ct. 2052, it was not unreasonable to decide not to file a motion for recusal. Judge Baer had ruled in his client's favor after the initial suppression hearing, and counsel might sensibly have believed that there was more than a fair chance that he would stand by his initial ruling. Although his prediction was wrong, his conduct was not unreasonable. Indeed, counsel may well have compared the chance that Judge Baer would change his mind on rehearing with the chance that a different judge would not rule in favor of his client, and, despite—or perhaps because of—the uproar that had attended Judge Baer's original ruling, may have concluded that his client was better off in Judge Baer's courtroom than in any other. "[A]ctions or omissions [by counsel] that 'might be con-

sidered sound trial strategy' do not constitute ineffective assistance." *United States v. Berkovich*, 168 F.3d 64, 67 (2d Cir.) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052), *cert. denied*, —— U.S. ——, 120 S.Ct. 127, 145 L.Ed.2d 107 (1999). We therefore hold that Bayless's trial counsel did not render ineffective assistance.

### C. The Propriety of Granting the Motion for Reconsideration

Having found that the presence of Judge Baer is in no sense a ground for reversal, we turn to the merits of his ruling. After the rehearing at which the government introduced new testimony, Judge Baer decided to admit the evidence seized from Bayless's car, as well as her post-arrest statements. In this regard, Bayless first argues that Judge Baer erred when he granted the government's motion to reopen the suppression hearing. The argument is meritless.

█ This circuit has not explicitly ruled on the proper standard of review of a district court's decision to grant or deny a motion for reconsideration of a suppression order. Other circuits, however, have held that such decisions should be reviewed for abuse of discretion. *See United States v. Dickerson*, 166 F.3d 667, 678 (4th Cir.1999); *United States v. Hassan*, 83 F.3d 693, 696 (5th Cir.1996); *United States v. Roberts*, 978 F.2d 17, 20 (1st Cir.1992); *United States v. Buffington*, 815 F.2d 1292, 1298 (9th Cir.1987). And we have adopted that standard in the analogous case of a district court's decision to grant a motion for reconsideration of an order denying a motion to dismiss. *See Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir.1995). We conclude that the abuse of discretion standard accurately reflects the degree of deference properly accorded a district court's decisions regarding evidentiary matters and the general conduct of trials, and join our sister circuits in adopting it.

Some courts have applied a rule requiring the government—when it moves for reconsideration of a suppression order on the ground that it can introduce new evidence intended to show that no Fourth Amendment violation occurred—to proffer a justification for its failure to present the relevant evidence at the original suppression hearing. *See, e.g., United States v. Villabona–Garnica*, 63 F.3d 1051, 1055 (11th Cir.1995) ("[B]y failing to raise [an] issue at [a] suppression hearing without offering any justification therefor, the government waive[s] its right to assert it in subsequent proceedings." (quoting *United States v. Thompson*, 710 F.2d 1500, 1504 (11th Cir.1983)) (internal quotation marks omitted) (alterations in *Villabona–Garnica*)); *McRae v. United States*, 420 F.2d 1283, 1286–88 (D.C.Cir.1969). Other courts, citing a policy in favor of introduction of lawfully obtained evidence, have declined to impose such a justification requirement. *See United States v. Rabb*, 752 F.2d 1320, 1323 (9th Cir.1984) ("We reject *McRae*'s 'justification' requirement and adopt the Fifth and Seventh Circuits' position: if the record reveals matters which indicate that the evidence was lawfully obtained, the district court may reconsider its suppression order at trial."); *United States v. Regilio*, 669 F.2d 1169, 1177 (7th Cir.1981) ("If matters appearing [after the original suppression decision] indicate that no constitutional violation occurred, society's interest in admitting all relevant evidence militates strongly in favor of permitting reconsideration."); *United States v. Scott*, 524 F.2d 465, 467 (5th Cir.1975).

█ We need not decide which of these two approaches is preferable, because we find that the government adequately justified its decision not to introduce the testimony of Sergeant Bentley at the original suppression hearing. Given that Sergeant Bentley's testimony echoed that of Officer Carroll, the government had no reason to believe that his testimony would be any-

thing but cumulative.[4] Judge Baer's decision, in the interests of justice, to reopen the suppression hearing and to allow the government to introduce testimony of the officer in charge at the time of the arrest, was therefore not in error. *See McRae,* 420 F.2d at 1289. *McRae* is the rare case in which a court of appeals found a district court's decision to grant a motion for reconsideration to be in error. Then–Chief Judge Bazelon noted, however, that "[t]he situation might be different" if the government had sought to introduce the corroborating testimony of a second arresting police officer at the second hearing, and had provided a good reason why he did not testify at the first hearing. *Id.* That is exactly the case here.

■ As we have said in a similar situation, "vague notions of unfairness, that the government should not have 'two bites' off the same apple, ought not control." *United States v. Tucker,* 380 F.2d 206, 214 (2d Cir.1967) (commenting that no injustice would result if the government were allowed to withhold the identities of its informants until after a suppression hearing and then, if the motion to suppress was granted, to move to reopen the hearing and disclose their identities). We conclude that Judge Baer acted correctly in granting the government's motion.

### D. Reasonable Suspicion

Because it was proper to grant the reconsideration motion, we review this case on the basis of the evidence before Judge Baer at the second hearing. Accordingly, we need not and do not consider whether Judge Baer's initial decision to grant Bayless's suppression motion, made on the basis of the evidence before him in the first hearing, was erroneous.

*1. Standard of review.*—The Supreme Court has directed the courts of appeals to review a determination of reasonable suspicion by a district court *de novo.* *See Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). The Court cautioned, however, that "findings of historical fact" should be reviewed only for clear error. *Id.* And this circuit has held that in reviewing the denial of a suppression motion, the evidence supporting the denial must be construed in the light most favorable to the government. *See, e.g., United States v. Peterson,* 100 F.3d 7, 11 (2d Cir.1996).

■ *2. The governing legal standard.*—*Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), first delineated the contours of a limited investigative stop, now frequently called a *Terry* stop. *Terry* held that a police officer can stop and briefly detain a person if the officer has a reasonable suspicion "that criminal activity may be afoot." *Id.* at 30, 88 S.Ct. 1868. In deciding whether a *Terry* stop is reasonable under the Fourth Amendment, a reviewing court must determine, first, "whether the officer's action was justified at its inception, and [second,] whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20, 88 S.Ct. 1868. It is the first prong of the *Terry* test that is at issue here.

■ This circuit has characterized the quantum of suspicion necessary under the first prong of *Terry* as "reasonable suspicion, based on specific and articulable facts, of unlawful conduct." *United States v. Scopo,* 19 F.3d 777, 781 (2d Cir.1994) (quoting *United States v. Hassan El,* 5 F.3d 726, 729 (4th Cir.1993)) (internal quotation marks omitted). Because a *Terry*

---

**4.** At the original suppression hearing, Judge Baer stated, "I know what we have factually. We have these four men that the cops stared at, and they took off." Appellant's Appendix at 157. He later reiterated, "I think [the four men] walked away quickly and male one was seen to run," and when counsel for the gov-ernment agreed, stated, "All right. Really then I think we're at one with respect to the facts." *Id.* at 163–64. Thus, the government may well have been misled by these comments into believing that Sergeant Bentley's corroborating testimony was not needed.

stop impinges to a lesser extent on Fourth Amendment concerns than does an arrest or search, the stricter standard of probable cause does not apply. *See, e.g., United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). As we have also said, "the concept of reasonable suspicion is not susceptible to precise definition." *United States v. Glover,* 957 F.2d 1004, 1009 (2d Cir.1992). Nevertheless, it is clear that "some minimal level of objective justification" is required, *id.* at 1009–10 (quoting *Sokolow,* 490 U.S. at 7, 109 S.Ct. 1581 (quoting *INS v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984))), and that "inchoate suspicion or mere hunch" will not suffice, *id.* at 1010. Reasonable suspicion is an objective standard; hence, the subjective intentions or motives of the officer making the stop are irrelevant. *See id.*

■ When evaluating the reasonableness of a *Terry* stop, the reviewing court must consider "the totality of the circumstances" surrounding the stop. *Sokolow,* 490 U.S. at 8, 109 S.Ct. 1581 (quoting *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). And the court must evaluate those circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Oates,* 560 F.2d 45, 61 (2d Cir.1977). In the case of a suspected drug transaction, this circuit has held that the reasonable suspicion inquiry must ask if "the conduct would appear suspect to one familiar with the practices of narcotics couriers, albeit the pattern of behavior is innocuous to the untrained observer." *Glover,* 957 F.2d at 1010 (quoting *United States v. Villegas,* 928 F.2d 512, 516 (2d Cir.1991)). But a district court must not merely defer to the police officer's judgment. "The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who

must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." *Terry,* 392 U.S. at 21, 88 S.Ct. 1868.

■ *3. The evidence before Judge Baer at the second hearing.*—At the second hearing, Judge Baer was able to hear the testimony of Sergeant Bentley, the officer in charge on the morning of Bayless's arrest. Sergeant Bentley and Officer Carroll testified that several factors combined to make them suspicious of Bayless: (1) she was out at an early hour (5 a.m.); (2) her car had out-of-state license plates; (3) she was spotted driving slowly and double-parking; (4) the neighborhood where she was observed, Washington Heights, was known for drug activity; (5) at least one of the men who loaded the trunk ran away from the scene upon observing the police officers; and (6) the men loading the car did so very quickly and in an "orchestrated" fashion, and had no conversation or interaction with Bayless. Judge Baer, at the second hearing, credited the testimony of Sergeant Bentley, which corroborated the earlier testimony of Officer Carroll. Accordingly, we must decide whether these factors, to which Sergeant Bentley testified, taken together, provided "a particularized and objective basis for suspecting" Bayless of a crime. *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

■ As the Supreme Court said in *Terry,* "[t]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." *Terry,* 392 U.S. at 21 n. 18, 88 S.Ct. 1868. *Terry* explicitly recognized that specificity was essential in part because according the police unfettered discretion to stop and frisk could lead to harassment of minority groups and "severely exacerbat[e] ... police-community tensions." *Id.* at 14 n. 11, 88 S.Ct. 1868. The Court commented, "[T]he degree of community resentment aroused by particular practices is clearly relevant to an assessment of the

134

quality of the intrusion upon reasonable expectations of personal security caused by those practices." *Id.* at 17 n. 14, 88 S.Ct. 1868.

The factors invoked by the police to justify their stop of Bayless vary in their weightiness, that is, their salience to the question whether crime is afoot. Standing alone, some of these factors would be innocuous, and some perhaps even inappropriate. *See Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct."). The final factor—the strange behavior of the men who loaded the duffel bags into the trunk of her car—however, is itself an appropriate and weighty factor. The speed with which the men loaded the bags into the trunk and dissociated themselves from the car, together with the absence of any communication between the driver and the men, provide a specific basis for the police officers' suspicion that they were witnessing an illicit transaction that the participants did not want to prolong.

This weighty factor makes the case before us easy. In its presence, the sometimes innocuous factors such as the time of day and Bayless's out-of-state license plates take on added significance. When joined to the furtive loading of the car, they strengthen the likelihood of a drug transaction. Similarly, the men's odd behavior while loading the car makes factors such as the high-crime neighborhood and flight more significant. *Cf. United States v. Martinez,* 54 F.3d 1040, 1045, 1046 (2d Cir.1995) (Calabresi, *J.,* concurring) (noting that while "the aggregation of many small pieces of data—which are not evidence at all because every one is in equipoise—can never establish proof beyond a reasonable doubt," there may be one "conditional fact" which, were it present, would give those pieces of data enough evidentia-ry significance to suffice for proof even beyond a reasonable doubt).

Taken all together, the facts and circumstances relied on by the police were sufficient to give rise to reasonable suspicion. The *Terry* stop of Bayless's car was therefore warranted, and Judge Baer was not in error when he decided, after hearing all the evidence, that no Fourth Amendment violation had occurred.

\* \* \*

The judgment of the district court is AFFIRMED.