IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————————

No. 11-15558

———————————

D.C. Docket No. 3:11-cr-00124-RBD-MCR-1

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

versus

KAREEN RASUL GRIFFIN,
a.k.a. Tahorri R. Jackson,
a.k.a. Kareem Griffin,

Defendant - Appellee.

———————————

Appeal from the United States District Court
for the Middle District of Florida

———————————

ORDER ON REHEARING EN BANC

Before CARNES, Chief Judge, TJOFLAT, DUBINA, BARKETT, HULL, MARCUS, WILSON, PRYOR, MARTIN, and JORDAN, Circuit Judges.

BY THE COURT:

A member of this Court in active service having requested a poll on whether this case should be reheard by the Court sitting en banc, and a majority of the

judges in active service on this Court having voted against granting a rehearing en

banc, IT IS ORDERED that the Suggestion of Rehearing En Banc is DENIED.

CHIEF JUDGE

BARKETT, Circuit Judge, dissenting from the denial of rehearing en banc, in which MARTIN, Circuit Judge, joins:

I agree that Kareen Griffin was legitimately stopped during the "investigation of a petit theft" (attempted shoplifting from a children's store), but there is no evidence in this record establishing reasonable suspicion that Mr. Griffin was "armed and presently dangerous" warranting a pat-down search of his body for weapons. Terry v. Ohio, 392 U.S. 1, 24 (1968). Terry made clear that a stop is one thing and a frisk is quite another. The reasonable suspicion required to justify a stop of an individual is analytically distinct from the reasonable suspicion required to frisk a suspect once they are stopped. Whereas an officer must have reasonable suspicion that "criminal activity may be afoot" to justify an investigative stop, id. at 30, in order to also justify a pat-down frisk, the officer must have reasonable suspicion that an individual is "armed and presently dangerous," id. at 24.

I can find no case from this circuit or any other that has permitted a frisk of a lone attempted shoplifter. Mr. Griffin's suspected offense was by definition non-violent[1] and nothing about his appearance or actions suggested that he was armed.

---

[1] Shoplifting, known as petit theft in the Florida Statutes, does not involve an act of violence. Compare Fla. Stat. § 812.014 (3)(a) (2011) (defining petit theft) with id. § 812.13 ("'Robbery' means the taking of money or other property . . . from the person or custody of another . . . when in the course of the taking there is the use of force, violence, assault, or putting in fear."). There is no evidence in the record and I am unaware of any case which suggests that individuals that engage in shoplifting, a crime predicated on evading detection, are even minimally likely to be armed. Moreover, Officer Edwards had specific knowledge that Mr.

3

The investigating officer did not observe any bulges on Mr. Griffin's person to suggest the presence of a weapon; nor did Mr. Griffin make any furtive movements towards his pockets or waist area.[2] As a result, the only factors that appear to be driving the panel opinion are that Mr. Griffin did not immediately stop when told to do so by the investigating officer and that Mr. Griffin was stopped in a so-called "high-crime neighborhood." Neither of these conditions, independently or in combination, is sufficient to justify a pat-down search under Terry. More importantly, the panel opinion's overreliance on Mr. Griffin's minimally evasive actions and the type of neighborhood in which he was stopped has pernicious implications for the civil liberties of innocent individuals.

I.

The panel opinion's reliance on "evasiveness," in the absence of any evidence that Mr. Griffin was armed or presently dangerous, threatens the civil liberties of all individuals living in high-crime communities. Mr. Griffin's "evasive" behavior consisted of walking briskly away from Officer Edwards, looking over his shoulder, and not immediately obeying his command to stop.

---

Griffin was accused of shoplifting and not some other, potentially violent form of robbery. At the suppression hearing, Officer Edwards stated that when he encountered Mr. Griffin he told him that he "was conducting an investigation for petty theft."

[2] Indeed, it was not until after Officer Edwards initiated the pat-down search and manipulated battery-like objects in Mr. Griffin's back pocket that he became suspicious that Mr. Griffin had any weapon-like contraband on his person. The objects in Mr. Griffin's back pocket turned out to be shotgun bullets, which led Mr. Griffin to being charged as a felon in possession of ammunition.

4

None of these actions constitute particularized evidence that Mr. Griffin was armed or dangerous, as required to frisk an individual for weapons.[3] Moreover, there are often innocent reasons for walking away, even briskly, from a police officer. As Justice Stevens has explained:

> Among some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence. For such a person, unprovoked flight is neither "aberrant" nor "abnormal." Moreover, these concerns and fears are known to the police officers themselves, and are validated by law enforcement investigations into their own practices. Accordingly, the evidence supporting the reasonableness of these beliefs is too pervasive to be dismissed as random or rare, and too persuasive to be disparaged as inconclusive or insufficient.

Illinois v. Wardlow, 528 U.S. 119, 132-34 (2000) (Stevens, J., concurring in part and dissenting in part) (internal citations omitted). This is not to suggest that an individual's evasive actions have no relevance to a Fourth Amendment inquiry, but that a suspect's minimally evasive actions during the investigation of a petit theft do not provide much support, if any, for the notion that he is armed and presently

---

[3] Looking over one's shoulder while being trailed by a police officer is not "evasive" or suspicious behavior. Cf. United States v. Urrieta, 520 F.3d 569, 577 (6th Cir. 2008) ("Although nervousness may be considered as part of the overall circumstances giving rise to a reasonable suspicion, this court has found nervousness inherently unsuspicious, and has therefore given it very limited or no weight in the reasonable-suspicion calculation."); United States v. McKoy, 428 F.3d 38, 40 (1st Cir. 2005) ("Nervousness is a common and entirely natural reaction to police presence[.]"); United States v. Portillo-Aguirre, 311 F.3d 647, 656 n. 49 (5th Cir. 2002) (noting that courts "often give little or no weight to an officer's conclusional statement that a suspect appeared nervous"); United States v. Jones, 269 F.3d 919, 928 (8th Cir. 2001) (same).

dangerous. Moreover, the Fourth Amendment requires that we <u>balance</u> the government's interest in preventing and stopping crime against the interests of innocent individuals from being unreasonably frisked, including those in communities that fear and avoid police contact.

Because there was nothing about the manner in which Mr. Griffin failed to stop, nor in his general conduct or appearance, that would suggest he was armed or dangerous, the panel opinion also relies heavily on the fact that the frisk took place in a high-crime neighborhood. I recognize, of course, that contextual factors like the type of neighborhood where an encounter occurs may be relevant to whether there is reasonable suspicion to justify a frisk. However, here, the fact that the stop occurred in a high-crime area cannot, on its own, justify this frisk. <u>Brown v. Texas</u>, 443 U.S. 47, 52 (1979) (holding that presence in high-crime neighborhood alone is insufficient to justify stop). The vast majority of people that live, work, or travel through high-crime neighborhoods do not participate in any criminal activities, much less activities that put officers and other community members at risk. This is, in part, why several of our sister circuits have warned of "the dangers of relying too easily or too heavily on these contextual factors." <u>United States v. Caruthers</u>, 458 F.3d 459, 467 (6th Cir. 2006); <u>see also</u> <u>United States v. Woodrum</u>, 202 F.3d 1, 7 (1st Cir. 2000) ("[A]ny person who happened to wander into a high-crime area, late at night, in the immediate aftermath of a serious crime, could be

6

detained."); United States v. Bayless, 201 F.3d 116, 134 (2d Cir. 2000) (warning against sole reliance on fact that stop took place in high-crime neighborhood).

Focusing on the fact that a crime occurs in a purportedly high-crime area carries with it other significant risks. In addition to eroding the liberty of all individuals in these communities, the high-crime neighborhood designation "raises special concerns of racial, ethnic, and socioeconomic profiling." Caruthers, 458 F.3d at 467. The Terry decision itself recognized these dangers, requiring individualized suspicion in part "because according the police unfettered discretion to stop and frisk could lead to harassment of minority groups and 'severely exacerbat[e] . . . police-community tensions.'" Bayless, 201 F.3d at 133 (quoting Terry, 392 U.S. at 14 n.11). Moreover, because neighborhoods described as "high-crime" are almost always poor communities of color,[4] excessively-broad police discretion to frisk suspects in such neighborhoods facilitates the disproportionate targeting of poor people of color by law enforcement, contributing to unjustifiable levels of racial and socioeconomic disparities in the criminal justice system.[5]

---

[4] See David A. Harris, Factors for Reasonable Suspicion: When Black and Poor Means Stopped and Frisked, 69 Ind. L.J. 659, 677-78 (Summer 1994) ("African Americans and Hispanic Americans make up almost all of the population in most of the neighborhoods the police regard as high crime areas.").

[5] Racial disparities in American prison populations are well documented. See, e.g., The Pew Ctr. on the States, One in 31: The Long Arm of American Corrections 7 (2009), http://www.pewstates.org/uploadedFiles/PCS_Assets/2009/PSPP_1in31_report_FINAL_WEB_3-26-09.pdf (finding that black adults are more than four times as likely as whites and over two and a half times as likely than hispanics to be incarcerated ). Racial disparities in arrest and incarceration rates are not explained by differential rates in offending. See, e.g., Ryan S. King,

To be sure, the panel opinion discussed other factors in deciding that the frisk of Mr. Griffin was justified. But those factors are plainly not relevant to the inquiry of whether Officer Edwards had reasonable suspicion to suspect that Mr. Griffin was armed and presently dangerous. The panel cites the need to defer to the judgment and experience of law enforcement officers, but ignores the prerequisite condition for extending such deference, which is that officers must, at minimum, demonstrate that their judgment was based on facts relevant to the reasonable suspicion inquiry. Here, there was nothing in the record that indicated that Officer Edwards even thought that Mr. Griffin was armed or dangerous. At the suppression hearing, the only explanation Officer Edwards gave as to why he frisked Mr. Griffin was that Mr. Griffin "had just committed a criminal act" (attempted shoplifting) and "was the individual [he] needed to make contact with." Apparently, the judgment and experience to which the panel deferred was Officer Edwards' fundamental misunderstanding of the Fourth Amendment, which was that he thought he was automatically entitled to frisk Mr. Griffin when he stopped him.

---

Disparities by Geography: The War on Drugs in America's Cities 10, 16 (2008)
http://www.sentencingproject.org/doc/publications/dp_drugarrestreport.pdf  (noting that African Americans are 3.4 times more likely to be arrested for a drug offense than whites despite the fact that whites and African Americans use drugs at similar rates). Class disparities in incarceration rates are also well documented. See, e.g., Bruce Western & Becky Petit, Incarceration & Social Inequality, 139 Dædalus 8, 9-11 (Summer 2010) available at
http://www.amacad.org/publications/daedalus/10_summer_western.pdf.

Nor is the fact that there were six to eight other individuals present on the street when Mr. Griffin was stopped relevant to the Terry inquiry in this case. The panel opinion does not explain why the presence of six to eight individuals on a street in front of a shopping complex—a rather unremarkable circumstance that is typical of a vast number of American streetscapes—is relevant to the inquiry of whether Mr. Griffin was armed and dangerous. There is nothing in this record to indicate that the presence of the other individuals on the street had any bearing on Officer Edwards' decision to frisk Mr. Griffin. Officer Edwards made no suggestion that the other individuals on the street were at all associated with Mr. Griffin. Nor is there any suggestion in the record that the individuals were located close enough to Officer Edwards' encounter with Mr. Griffin such that they would be endangered by any violence that may have ensued.

## II.

"The erosion of Fourth Amendment liberties comes not in dramatic leaps but in small steps, in decisions that seem 'fact-bound,' case-specific, and almost routine at first blush. Taken together, though, these steps can have broader implications for the constitutional rights of law-abiding citizens." United States v. Tinnie, 629 F.3d 749, 754 (7th Cir. 2011) (Hamilton, J., dissenting). This decision is one of these steps. It far exceeds the carefully drawn limits on police discretion established in Terry and threatens to justify pat-down searches of individuals

9

suspected of even the most minor non-violent crimes, as long as they are present in a "high-crime neighborhood."

We should not underestimate the reach of such a result. Stop-and-frisk policing has become, perhaps, the most broadly applied policing tool in modern urban police departments. See Delores Jones-Brown, et. al, Stop, Question & Frisk Policing Practices in New York City: A Primer 5 (2010), http://www.jjay.cuny.edu/web_images/PRIMER_electronic_version.pdf (noting the rise in stop and frisk policing practices in cities with available data). By authorizing such broad police officer discretion to effectuate stop-and-frisks, we open the door to abuse of the practice. We rarely see the negative impacts of stop-and-frisk policing because the stories of almost all innocent individuals wrongly stopped and searched do not make their way into the federal court system. In this regard, our Fourth Amendment law risks becoming skewed as it is informed primarily by fact patterns related to searches of unsympathetic litigants in the form of convicted criminals. But the limited scope of our appellate review of Fourth Amendment cases should not blind us to the significant harms to the communities that bear the brunt of abusive stop-and-frisk practices, including the erosion of individual liberty and dignity, communal and racial stigmatization, and even the loss of police legitimacy. See United States v. Goddard, 491 F.3d 457, 468-69 (D.C. Cir. 2007) (Brown, J., dissenting) (noting that a "sense of unfairness and

frustration festers and swells" as a result of abusive stop-and-frisk policing practices); see also Tinnie, 629 F.3d at 755-56 (Hamilton, J., dissenting) ("The effects that such long-condemned practices have on law-abiding citizens—fear, humiliation, anger, and a growing cynicism toward law enforcement in general—should come as no surprise."). As the Supreme Court warned in Terry:

> [I]t is simply fantastic to urge that such a procedure performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a 'petty indignity.' It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly.

Terry, 392 U.S. at 16-17. And if the experience of cities in other parts of the country is to be a guide, the burdens of abusive stop-and-frisk policing practices, unfortunately, fall disproportionately on innocent individuals. See Floyd v. The City of New York, No. 1:08-cv-01034 (S.D.N.Y. Aug. 12, 2013) (order granting judgment to plaintiffs), at 31-32 (finding that out of the 4.4 million Terry stops conducted by the NYPD between 2004 and 2012, 88 percent did not result in an arrest or summons and that no weapons were found in 98.5 percent of the 2.3 million frisks conducted over the same period).

For all of these reasons, I believe that the district court should be affirmed or, at the very least, that this case merits en banc review.

11