POOLER, Circuit Judge,
concurring in part and dissenting in part:
As this case was described by the Supreme Court in Bailey v. United States, “[t]he issue to be resolved is whether the seizure of the person was reasonable when he was stopped and detained at some distance away from the premises to be searched when the only justification for the detention was to ensure the safety and efficacy of the search.” 133 S.Ct. 1031, 1035 (emphasis added) (“Bailey III”). Such a justification is not appropriately used for a Terry stop, and this case should not be resolved on Terry grounds.
I believe that the initial stop was not supported by reasonable suspicion under Terry. And, while I concur with the majority that the police exceeded the bounds of Terry upon handcuffing Bailey and join in Part II.C.3.a. of the majority opinion, I would reverse for a new trial, untainted by the erroneously admitted evidence gathered from the initial stop and subsequent unlawful detention. For that reason, I respectfully dissent.
I.
Terry permits a police officer in “appropriate circumstances and in an appropriate manner [to] approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.” Terry v. Ohio, 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, police may only stop someone if there is “reasonable suspicion supported by articulable facts that criminal activity may be afoot.” United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (internal quotation marks omitted). Reasonable suspicion must be “based on specific and articulable facts” and not on an “inchoate suspicion or mere hunch.” United States v. Bayless, 201 F.3d 116, 132-33 (2d Cir.2000) (internal quotation marks omitted). We consider the “totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.” United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, *347 151 L.Ed.2d 740 (2002) (emphasis added) (internal quotation marks omitted).- “Terry explicitly recognized that specificity was essential in. part because according the police unfettered discretion to stop, and frisk could lead to harassment of minority groups and severely exacerbate police-community tensions.” Bayless, 201 F.3d at 133 (internal quotation marks and alterations omitted).
II.
In concluding that the detectives’ initial stop of Bailey was supported by reasonable suspicion, the majority lists four “ar-ticulable facts” that it concludes warranted the intrusion at issue here: (1) that at the time of the challenged stop, the detectives already had probable cause “to think that the apartment [at 103 Lake Drive] was the site of recent drug trafficking and contained a .380 caliber handgun,” Maj. Op. at [333]; (2) that the detectives watched Bailey leave the premises “through a gate that the police knew was accessible only from the rear basement level of the building,” id.; (3)' that both men fit the confidential informant’s “general description of ‘Polo,’” that is, a “short-haired, stocky, black male,” id. at [333]; and (4) the firearm which was the subject of the search warrant was “an easily transportable item of a sort frequently carried by drug dealers,” id. at [334].
With its enumeration of these four facts, the majority concludes that the totality of circumstances' “supported a reasonable suspicion to think that the men may have been engaged in criminal activity and were armed,” making the stop reasonable under Terry. Maj. Op. at [335]. In the next sections, I examine the majority’s facts regarding proximity to the premises and physical similarity to “Polo”: first, whether these facts may provide independent justifications for a Terry stop, and next, whether they would justify a stop under the “totality of the circumstances.” For the reasons discussed below, I cannot agree that this stbp was justified under Terry.
A.
As an initial matter, the majority’s reliance on the detectives’ observation of Bailéy and Middleton leaving the subject premises — that is, factors (1), (2) and (4) cited by the majority — is not enough, without more, to justify a stop under Terry. The Supreme Court has repeatedly emphasized that “[a]n individual’s presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.” Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); see also United States v. Swindle, 407 F.3d 562, 569 (2d Cir.2005) (“Swindle’s entering a known drug house does not itself suggest that a crime was afoot.”).
In Ybarra v. Illinois, the Court explained that even in the context of a search authorized by search warrant, the “‘narrow scope’ of the Terry exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized ... search is taking place.” 444 U.S. 85, 94, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (emphasis added). Although Ybarra involved a search warrant authorizing the search of a tavern rather than a private residence, I believe that its holding that mere presence at the site of the execution of a search warrant does not create individualized, reasonable suspicion is applicable more broadly, particularly in light of the Court’s emphasis on Terry’s carefully maintained “narrow scope.” Id. at 93, 100 S.Ct. 338.
*348 A number of other circuits have similarly concluded that presence alone in a suspicious area does not meet the requisite standard for reasonable suspicion under Terry. See, e.g., United States v. Black, 707 F.Sd 531, 542 (4th Cir.2013) (“The pertinent facts remaining ... are that the men were in a high crime area at night. These facts, even when coupled-with the officers’ irrational assumptions based on innocent facts, fail to support the conclusion that Officer Zastrow had reasonable suspicion that Black was engaging in criminal activity.”); United States v. Ritter, 416 F.3d 256, 269 (3d Cir.2005) (“Under Ybarra, [a] ‘cursory search for weapons’ clearly is not permitted absent a reasonable belief or suspicion that an individual encountered is armed.”); United States v. Cole, 628 F.2d 897, 899 (5th Cir.1980) (evidence gathered via patdown search of an individual who arrived at a private home when the police were preparing to execute a search warrant was inadmissible because the search of the individual was not supported by reasonable suspicion, and “[m]ere presence neither obviates nor satisfies the requirement of Terry.”).
This conclusion, that the detectives’ observation of Bailey merely departing the subject premises is not enough for reasonable suspicion, is further buttressed by the Supreme Court’s decision in this case. In rejecting our initial holding that Bailey’s detention was justified under Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the Supreme Court acknowledged that:
Although the danger of alerting occupants who remain inside may be of real concern in some instances, as in the case when a no-knock warrant has been issued, this safety rationale rests' on the false premise that a detention must take place. If the officers find that it would be dangerous to detain a departing individual in front of a residence, they are not required to stop him. And, where there are grounds to believe the departing occupant is dangerous, or involved in criminal activity, police will generally not need Summers to detain him at least for brief questioning, as they can rely instead on Terry.
Bailey III, 133 S.Ct. 1031, 1039 (2013) (emphasis added). The Court noted that Terry is the appropriate doctrine on which to rely for police to detain a “departing occupant” away from the subject premises, and in so writing, the Court also emphasized that there must be “grounds to believe the departing occupant is dangerous, or involved in criminal activity,” id., in order to lawfully detain that occupant. It seems clear, based on the reasoning provided in Bailey III, that simply departing from a premises about to be searched, without more, cannot be enough to justify a Terry stop.[1]
Though the majority relies on its first, second, and fourth factors to support reasonable suspicion, a closer look at this list leads me to the conclusion that they are all variatipns on the same theme — i.e., that Bailey and Middleton were seen leaving 103 Lake Drive, and because of this, the police had reasonable suspicion to stop them. The cases discussed above are clear that mere presence in a location known for *349 criminal activity is insufficient under Terry, and thus, the “articulable facts” linking Bailey to the subject premises and relied on by the majority are similarly insufficient to create reasonable suspicion. Upholding the detectives’ stop of Bailey in this case because of Bailey’s presence leaving 103 Lake Drive would constitute an unwarranted expansion of Terry’s scope.
B.
The remaining “articulable fact” — that both Bailey and Middleton resembled the confidential informant’s description ' of “Polo” — also did not create a reasonable suspicion to stop them. This is because generic descriptions of race, gender, and build, without more, have been held insufficient to justify reasonable suspicion.
“[A] description of race and gender alone will rarely provide reasonable suspicion justifying police search or seizure.” Brown v. City of Oneonta, 221 F.3d 329, 334 (2d Cir.2000); cf. Goodson v. City of Corpus Christi 202 F.3d 730, 733, 737 (5th Cir.2000) (in a Section 1983 action where suspect was described as “white male, approximately six feet tall, heavy-set, and dressed like a cowboy, possibly heading to a cowboy bar,” the Fifth Circuit stated that “[sjuch a description would simply be too vague, and fit too many .people, to constitute particular, articulable facts on which to base reasonable suspicion,” and reversed the district court’s grant of summary judgment). As the majority notes, race may properly be considered as one of several elements in identifying potential suspects for investigation, Maj. Op. at [335], however, because I conclude that the factors related to Bailey’s proximity to the subject premises were insufficient to create reasonable suspicion of criminal activity, we are left to consider the generic description of Polo’s race, gender, and build (and description of his short hairstyle). .This is simply insufficient, particularly where none of these descriptors are unique or remarkable, to give rise to the requisite individualized suspicion. See Swindle, 407 F.3d at 569-70 (“courts agree that race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop”); cf. United States v. Jones, 998 F.2d 883, 885 (10th Cir.1993) (no reasonable suspicion to stop defendants where description was of two black men in a black Mercedes “based solely on the color and manufacturer of the car, and the fact that it contáined two black men,” particularly because there was no showing by the government that “the sight of two African-Americans in a black Mercedes was a highly unusual event”).
Indeed, the facts we are left with apart from physical proximity to 103 Lake Drive — that Bailey and Middleton both shared race, gender, build and short hair styles with “Polo,” in a part of Long Island where, as of 2006, approximately 78 percent of the population in the relevant neighborhood was black, and approximately two thirds of American. adults were overweight-simply do not create a reasonable suspicion of involvement in criminal activity as to these particular two individuals.
C.
Finally, properly taking all four of the majority’s facts together does not change my view that this case does not fit within Terry’s narrow scope. Examining the totality of the circumstances, see Arvizu, 534 U.S. at 273, 122 S.Ct. 744, we- are lacking the essential ingredient for a Terry case: that is, some conduct observed by an officer that would lead the officer to reasonably suspect that criminal activity may be afoot, i.e., in the process of development.
*350 The majority relies on United States v. Salazar, 945 F.2d 47, 50-51 (2d Cir.1991) to suggest that factors like those at issue here — descriptions of a suspect’s height, coloring, gender and ethnicity, when combined with a person approaching a particular residence associated with criminal activity — are sufficient to support a Terry stop. See Maj. Op. at [333]. However, in Salazar, our Court emphasized that the person stopped had appeared nervous in front of the police.. 945 F.2d at 51. Understandably, nervousness, odd, or furtive behavior have all been identified by the Supreme. Court as an important factor in the reasonable suspicion analysis, because such behavior in the presence of law enforcement is reasonably linked to criminal activity. See Wardlow, 528 U.S. at 124, 120 S.Ct. 673 (“In this case, ... it was not merely respondent’s presence in an area of heavy narcotics trafficking that aroused the officers’ suspicion, but his unprovoked flight upon noticing the police. Our cases have ... recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.”); see also Arvi-zu, 534 U.S. at 270, 122 S.Ct. 744 (“The driver appeared stiff and his posture very rigid. He did not look at [Agent] Stod-dard and- seemed to be trying to pretend that Stoddard was not there. Stoddard thought this suspicious because in his experience on patrol most persons look over and see what is going on, and in that area most drivers give border patrol agents a friendly wave.”) (citation omitted); Florida v. Royer, 460 U.S. 491, 502 n. 2, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) (the police noted, among the other facts cited as justifying reasonable suspicion, that Royer “appeared pale and nervous, looking around at other people”).
In Bailey III, considering the specific facts of this case, Justice Kennedy enumerated several factors an officer might look to in order to lawfully detain a departing occupant under Terry. These included: “A suspect’s particular actions in leaving the scene, including whether he appears to be armed or fleeing with the evidence sought.” 133 S.Ct. at 1042. Here, there was no such evidence of suspicious or evasive behavior on Bailey or Middleton’s part. For example, there was no testimony that Bailey or Middleton were moving quickly or furtively, or that the detectives suspected that they had just purchased or sold drugs at 103 Lake Drive, or that one of them was readjusting something in his waistband that could reasonably be considered a firearm. Further, the “criminal activity” that had been reported at 103 Lake Drive and that provided the basis for the warrant affidavit was several days old. The confidential informant’s statement described conduct occurring days earlier, and as such, did not describe activity that could provide “a particularized and objective basis for suspecting legal wrongdoing” at the time of the stop. Arvizu, 534 U.S. at 273, 122 S.Ct. 744 (emphasis added) (internal quotation marks omitted).
It is obvious that the detectives suspected that either Bailey or Middleton could be “Polo,” the person whom the confidential informant had told them about. See App’x at 89-90 (“Q: And why did you follow them?” Officer Gorbecki: “To identify them and see what their purpose was for being at the residence.”). While I concede that this testimony evinces the detectives’ suspicion that one of these men could have been “Polo,” that is not what the law under Terry requires to justify a stop. Terry requires that the facts giving rise to reasonable suspicion be addressed towards whether Bailey in particular was “engaged in wrongdoing when they encountered him.” Sokolow, 490 U.S. at 7, 109 S.Ct. 1581 (emphasis added); see alsoBayless, 201 F.3d at 134 (the factors invoked by the *351 police to justify a Terry stop must be salient with respect “to the question [of] whether crime is afoot”).
The evidence here only showed that the confidential informant had identified someone named “Polo,” along with “other persons unknown” as likely occupants of the basement apartment, and that when the officers observed two men leaving the basement apartment — both of whom fit the generic details given by the confidential informant as to “Polo’s” appearance — they believed that one of the men could be “Polo.” However, instead of obtaining an arrest warrant, they decided to try to “identify them” and learn their “purpose” for being at the residence, all without particularized, articulable details as to why Bailey and/or Middleton were reasonably suspected of engaging in criminal activity at the time of the stop.[2]
Permitting a stop based on proximity to premises suspected of past criminal activity, together with mere similarity of gender, race, build and unremarkable hairstyle attributes, and without any perceived suspicious behavior, expands Terry beyond what the Supreme Court originally intended. That is to say, in cases “where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot,” limited investigatory stops and seizures are permissible under the Fourth Amendment. Terry, 392 U.S. at 30-31, 88 S.Ct. 1868 (emphasis added). The facts here make this a close case, but they are simply not close enough.
III.
I also find troubling that the detectives’ own testimony at the suppression hearing supports the conclusion that, contrary to the majority’s position, they did not perceive any conduct giving rise to a suspicion of criminal activity. Rather, they wanted to detain Bailey and Middleton in order to bring them back to the premises that was to be searched, i.e., under a Summers-type detention. This is made clear by Detective Gorbecki’s statement to Bailey, upon handcuffing him, that “[y]ou are not under arrest; you are being detained ... We’re about to execute a search warrant in your apartment.” Detective Gorbecki testified that once he brought Bailey back to the residence, he met some of the entry team officers in the driveway,' and they confirmed “that there was a handgun in plain view next to the bed and some crack cocaine on a bookshelf,” and it was at that point that Detective Gorbecki’s view of why they were holding Middleton and Bailey changed:
Q: [I]t changed from being a detention while the search warrant was being executed to what?
A: Now it was an arrest. .
When . pressed on cross-examination about why the detectives did not stop or detain Bailey and Middleton on the premises, Detective Gorbecki responded that it *352 was a “safety issue,” and that “if we stopped them too close to the residence and there are still people in the apartment we’ll search the individuals. If one of them finds out we did a search of the individuals, ... they could prepare themselves with weapons.” Detective Sneider described their actions by stating “[t]he procedure we follow is the same every time.... [I]f anyone leaves the house, we do not stop them next to the house. We let them leave the area, and then we detain them.”
All of this testimony leads to the same conclusion: the detectives were effectuating a detention pursuant to Summers, and the district court concluded as much, see United States v. Bailey, 468 F.Supp.2d 373, 379-82 (E.D.N.Y.2006) (“Bailey I”), as did this panel in our initial 2011 opinion. In fact, although the district court separately held that the stop could also be justified under Terry, the district court’s reasoning upholding the stop on Terry grounds was supported by Summers jurisprudence, in that the district court relied on United States v. Jaramillo, 25 F.3d 1146 (2d Cir.1994). In Jaramillo, our court allowed “an individual’s ownership or occupancy of private premises for which a search warrant has been obtained” to give rise to “sufficiently specific and articulable facts” to warrant a Terry stop by relying on Summers. Jaramillo, 25 F.3d at 1151.[3] We know now that these holdings and rationales are incorrect. In Bailey III, the Supreme Court explained that, under Summers:
detention is justified by the interests in executing a safe and efficient search, the decision to detain must be acted upon at the scene of the search and not at a later time in a more remote place. If officers elect to defer the detention until the suspect or departing occupant leaves the immediate vicinity, the lawfulness of detention is controlled by other standards, including ... a brief stop for questioning based on reasonable suspicion under Terry or an arrest based on probable cause. A suspect’s particular actions in leaving the scene, including whether he appears to be armed or fleeing with the evidence sought, and any information the officers acquire from those who are conducting the search, including information that incriminating evidence has been discovered, will bear, of course, on the lawfulness of a later stop or detention.
Bailey III, 133 S.Ct. at 1042 (emphasis added); see also id. at 1043 (Scalia, concurring) (“Bailey was seized a mile away. Ergo, Summers cannot sanction Bailey’s detention. It really is that simple.”).
The detectives in this case believed they were entitled to detain Bailey and Middleton away from the premises pursuant to the execution of the search warrant, i.e., under Summers. The Supreme Court has now clearly rejected this particular use of Summers-type detention, and our Court should not distort Terry’s narrow scope in an attempt to accommodate the detectives’ conduct.[4]
“Beyond Summers’ spatial bounds, seizures must comport with ordinary Fourth *353 Amendment principles.” Id. at 1045 (Scalia, J., concurring). Because the record does not support a conclusion that the detectives had grounds to believe that based on Bailey and Middleton’s “particular actions in leaving the scene,” id. at 1042 (Opinion of Kennedy, J.), they were dangerous or involved in criminal activity, I believe the initial stop was not supported by reasonable suspicion, and as such, was not justified under Terry.

IV.

While I agree that the police exceeded the bounds of Terry upon handcuffing Bailey, I do not share the majority’s conclusion that the erroneous admission of the post-arrest statements was harmless error. The admission of Bailey’s post-arrest statements, when considered along with the evidence gleaned as a result of the initially unlawful stop, was not harmless.
The evidence obtained as a result of the stop and unlawful handcuffing consisted of Bailey’s own statements confirming that 103 Lake Drive was his “house”; that his driver’s license confirmed that he used to live at a Bayshore address; that Bailey’s keys opened the basement apartment at 103 Lake Drive; and Bailey’s contradictory exclamation upon being handcuffed that “I don’t live there. Anything you find there ain’t mine, and I’m not cooperating with your investigation.” Such evidence was clearly the type with which a jury could, and likely did, convict him. As such, the admission of the tainted evidence in this case does nob give us any “fair assurance- that the jury’s judgment was not substantially swayed” by the erroneous admission of this evidence. See United States v. Estrada, 430 F.3d 606, 622 (2d Cir.2005) (internal quotation marks omitted).
The bulk of the disputed facts at trial centered on whether Bailey was indeed “Polo,” and whether it was Bailey who exercised control and ’ possession of the subject premises. Without the evidence described ábove, the jury would have had on the one hand the identification made by the confidential informant, as well as his testimony at trial, and on the other hand, the testimony of the landlady, Meltona Sykes, that someone other than Bailey was the tenant who lived in and possessed the basement apartment at issue.[5] Certainly, the confidential informant’s testimony was both damning and highly relevant to Bailey’s identification as “Polo.” But Bailey was entitled to a jury’s consideration of the competing testimonial and identification evidence — and the respective factual inferences to be drawn from such evidence— without the prejudicial and improperly admitted evidence that indubitably and substantially swayed the jury’s judgment.[6]
“[Bjefore a federal constitutional error can be held harmless, the court must be *354 able to declare a belief that it was harmless beyond a reasonable doubt.” Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Considering in particular Bailey’s own statements confirming 103 Lake Drive as his home, and that his keys (seized during the stop) opened the locks on the basement apartment, I cannot conclude that the error was harmless, i.e., that this wrongfully admitted evidence was “unimportant in relation to everything else the jury considered on the issue in question.” Yates v. Evatt, 500 U.S. 391, 403, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991), overruled on other grounds by Estelle v. McGuire, 502 U.S. 62, 72 n. 4, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). I would hold that all of the evidence as a result of the stop and the unlawful detention should have been suppressed, and thus, I cannot join in the majority’s conclusion of harmless error. I would reverse and remand for a new trial.
V.
For all of these reasons, though I join in Part II.C.3.a of the majority opinion, I respectfully dissent from the remainder.

. The majority opinion seems to acknowledge this portion of Bailey III in reasoning that the Summers standard is "distinct” from Terry, and that Terry "requir[es] reasonable suspicion of criminal conduct beyond proximity to a location of suspected crime.” Maj. Op. at [334]. At the same time, however, the majority fails to recognize that most of the "ar-ticulable facts” on which it relies here are entirely dependent on spatial proximity to the subject premises about to be searched, and have nothing to do with reasonable suspicion of criminal conduct.

. The majority's reliance on United States v. Hensley, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) for the proposition that a Terry stop may be permissible where there are facts giving rise to reasonable suspicion that a particular individual is wanted "in connection with a completed felony,” see id. at 229, 105 S.Ct. 675, does not change the analysis here, in my opinion. Hensley involved the application of Terry to a named individual who had a "wanted flyer” issued against him for his participation in a specific armed robbery that had occurred a few days earlier. Id. at 223, 105 S.Ct. 675 ("We granted certiorari in this case ... to determine whether police officers may stop and briefly detain a person who is the subject of a ‘wanted flyer’ while they attempt to find out whether an arrest warrant had been issued.”). The Supreme Court was careful- to limit Hensley, noting that "[w]e need not and do not decide today whether Terry stops to investigate all past crimes," however serious, are permitted.” Id. at 227, 105 S.Ct. 675.

. The majority opinion attempts to sidestep this analytical flaw in the district court’s suppression ruling by noting that "we here clarify that our own Terry analysis does not depend on Jaramillo.” Maj. Op. at [334]. However, this does not alter the fact that the district court's specific conclusions underpinning its denial of Bailey’s suppression motion were in the context of an incorrect view of the interactions between Terry and Summers.

. I find this all the more pertinent here, where the detectives clearly had a strong case mounted against the tenant at 103 Lake Drive, based on their work with the confidential informant and their lawfully obtained *353 search warrant. This is not a situation in which the police were struggling to gather evidence, nor where they could not have waited and obtained an actual arrest warrant for the resident of the subject premises upon executing the search warrant.

. At trial, the jury also had the benefit of Middleton's testimony as a hostile witness, which further corroborated that Bailey was known as "Polo.” However, Middleton was only seized by the police as a result of the unlawful stop, and as such, the police may not have had the benefit of his testimony had . the stop properly been deemed illegal.

. Juries are generally instructed on witness credibility. Without the benefit of the additional, improperly admitted evidence, the confidential informant's credibility, and his motivations for testifying on behalf of the government, may have been afforded significantly different weight, given that the jury heard testimony that the confidential informant's tip was given in exchange for "get[ting] [his] felony thrown out."